RENO CLUB, INC., A CORPORATION, APPELLANT, *v.* YOUNG INVESTMENT CO., A CORPORATION, RESPONDENT.

No. 3478

July 7, 1947.

182 P.2d 1011.

314

M. A. *Diskin*, of Reno, for Appellant.

*Morgan, Brown & Wells* and *Harland L. Heward*, all of Reno, for Respondent.

## OPINION

By the Court, HORSEY, J.:

This is an action for specific performance. Appellant will be referred to herein as plaintiff, respondent as defendant.

The defendant, in the district court, demurred to the amended complaint, the demurrer was sustained, the plaintiff elected to stand upon its amended complaint, and judgment of dismissal was thereupon ordered by that court, and this appeal is from such judgment.

Besides the formal allegations, it was alleged, in substance, in the amended complaint that the defendant corporation, at all times mentioned therein, was the owner of the premises consisting of that certain storeroom and basement known as 232 North Virginia Street, Reno, Washoe County, Nevada, in what is known as the "Quinn Building," together with the appurtenances, certain fixtures and personal property situated upon said premises.

That on the 29th day of October 1934, defendant, as lessor of the above described premises, made, executed and delivered to plaintiff, as lessee, a written lease for the period beginning October 27, 1934, and ending October 26, 1937, at a monthly rental of $250, the first and last month being paid in advance; that under the

terms and provisions of said lease, plaintiff, as lessee, was granted the option of extending said lease for an additional period of three years; that immediately after the execution of said lease, plaintiff entered into possession of said premises, and fully complied with the terms thereof.

That, pursuant to the said option for three years' extension of said lease, the defendant, on August 29, 1936, granted plaintiff, as lessee, an extension of said lease, from October 26, 1937, to October 26, 1940, under the same terms and conditions as in the original lease, and at the same time, in the same instrument, the defendant, as lessor, gave and granted to plaintiff, as lessee, an option for a further extension of said lease, and said lease was thereupon renewed for a period expiring October 26, 1943.

That on November 25, 1939, by an agreement in writing, and for the consideration therein expressed, the defendant, as lessor, gave and granted plaintiff, as lessee, the right and option to extend or renew the lease dated October 29, 1934, to and including October 26, 1948, under the same terms and conditions.

That during all the time mentioned in the amended complaint, and to and including May 11, 1942, plaintiff was in possession of the said premises, and had fully complied with all the terms of said lease and extensions thereof; that plaintiff, at great cost and expense, had fitted and furnished the said premises with a complete Tango counter, and 100 cushioned stools, and a complete public address system with microphones, together with office equipment and furnishings.

That on May 11, 1942, plaintiff was in complete possession of the premises hereinabove described, and had complied with all the provisions of said lease, and was entitled to retain possession of the said premises as lessee until October 26, 1943, and, as above stated, owned and possessed a written option for an extension of said lease until October 26, 1948. That on said May

11, 1942, the defendant promised and agreed with the plaintiff that if plaintiff would surrender possession of said premises, and would surrender said lease and option for renewal, to defendant for cancellation, that defendant would immediately make, execute, and deliver to plaintiff a written option, under the terms of which plaintiff would have the right at any time after one (1) year from May 11, 1942, to lease the aforesaid premises for a period extending to October 26, 1948, at a rental of $350 per month.

That on May 11, 1942, in reliance upon said representations and agreement of defendant, plaintiff surrendered possession of the aforesaid premises to defendant, and delivered to defendant for cancellation the aforesaid lease and option for renewal, and thereupon the defendant prepared, executed, and delivered to plaintiff an option in words and figures as follows, to wit:

"Reno, Nevada,
"May 11, 1942

"Reno Club, Inc.
"Reno, Nevada.
"Gentlemen:

"In consideration of the sum of $1.00 paid to the undersigned, Young Investment Company, a corporation, together with other good and valuable consideration, the undersigned hereby gives and grants to the Reno Club, Inc., or to its assigns, the exclusive right and option to lease the premises known as 232 North Virginia Street, Reno, Nevada, together with the appurtenances, fixtures, trade fixtures and equipment now therein, upon the termination of a lease which the undersigned has executed to William Harrah, which lease extends for a period of one year.

"In the event that the general war in which the so-called 'United Nations' are at war with the Axis Nations of the world has not been concluded and peace treaties executed at the end of one year, then this option shall continue from month to month thereafter until the

general treaty of peace has been concluded between the Axis Nations on the one part and the United Nations on the other part.

"The lease for which this option is given shall be for a term which is to be concluded October 26, 1948, and the rental shall be $350.00 per month.

Young Investment Company,<br>
"By F. P. Quinn

"Seal                    "President

"Wm. M. Kearney
     "Secy."

The foregoing allegations of the amended complaint are followed by other allegations therein appropriate to complete the statement of a cause of action for specific performance.

The plaintiff, in the prayer to the amended complaint, demands judgment that the defendant be required to specifically perform the said agreement, and to execute and deliver a lease for the premises described, and to let plaintiff into possession thereof, and for such further relief as may be equitable, and for costs of the action.

The defendant demurred to the amended complaint upon the following grounds:

"I.   That the said amended complaint does not state facts sufficient to constitute a cause of action."

"II.   That the allegations contained in the second sentence in paragraph VII of plaintiff's amended complaint are uncertain in that it cannot be determined therefrom, or at all, when the improvements were made upon the premises in question, what the cost of the improvements was at the time they were constructed and what the value of said improvements now is."

The district court sustained the defendant's said demurrer, and District Judge McKnight, in his written order so doing and ordering that judgment of dismissal be entered, stated, as grounds and reasons for sustaining the demurrer, the following:

"(a) That under the terms of the option agreement

set forth in Paragraph IX of the amended complaint, the plaintiff has no legal right to demand a lease from defendant for the premises described, until the general Peace Treaties have been concluded between the United Nations and the Axis Nations.

"(b) That plaintiff's action in instituting this suit is premature, and no legal obligation exists in defendant to execute to plaintiff a lease for the said premises until the Peace Treaties between the United Nations and the Axis Nations are concluded.

"(c) That the memorandum agreement set forth in Paragraph IX of said amended complaint, is incomplete, uncertain and ambiguous in its provisions, and not capable of being specifically performed."

We are, on this appeal, required to determine the correctness of the district court's foregoing order sustaining the demurrer and ordering the entering of judgment of dismissal.

■ The option agreement appears to be in ordinary and plain language. Its meaning seems clear. With a usual recital as to consideration, it unequivocally and unconditionally, in the first paragraph of the option, in the form of a letter, "hereby gives and grants to the Reno Club, Inc., or to its assigns, the exclusive right and option to lease the premises known as 232 North Virginia Street, Reno, Nevada, together with the appurtenances, fixtures, trade fixtures and equipment now therein, upon the termination of a lease which the undersigned has executed to William Harrah, which lease extends for a period of one year." There is no condition or proviso attached to the sentence, to the effect that the option, or the right to exercise it, is conditional upon the conclusion of the war, or the execution of any peace treaty, or treaties. By the language used, "gives and grants hereby," the conclusion that the defendant thereby agreed to, and granted, an immediate and unconditional option to lease the said premises "upon the

termination of a lease which the undersigned has exe-
cuted to William Harrah, which lease extends for a
period of one year," seems clearly indicated. The
optionee, Reno Club, Inc., was given the definite, positive
right to exercise the option upon the termination of the
Harrah lease, at the end of the year for which said lease
had been given, and regardless and irrespective of
whether or not the general war mentioned in the next
paragraph of the option had been concluded, and a peace
treaty or treaties executed.

It appeared from the oral argument, at one point, that
the Reno Club, Inc., was then owned by an enemy alien,
who, doubtless for reasons of a personal nature, might
not desire, or deem it expedient, to resume active busi-
ness of the nature in which he had been engaged under
the original lease and the renewal he was surrendering,
until the war had been concluded. Carrying out that
idea, or policy, he doubtless contemplated that if the war
had not been concluded and peace treaties executed, or,
at least, if the war had not been concluded, by the end of
the one-year term of the Harrah lease, he would not be
in a position to exercise the option as provided in the
first paragraph thereof, that is upon the termination of
the Harrah lease, but would need more time.

Apparently, because of that situation paragraph two
was included. Paragraph two of the option letter con-
tains the words "this option," meaning the option which
had been, as above stated, positively and uncondition-
ally granted by the preceding paragraph one, and pro-
vided for its continuance or extension, subject to the
condition precedent "that the general war in which the
so-called 'United Nations' are at war with the Axis
Nations of the world has not been concluded and peace
treaties executed at the end of one year."

Not only do we have, in paragraph one, language
sufficient to show that the parties intended an option in
praesenti, to come into existence immediately upon the

option being signed and delivered to plaintiff, and, in paragraph two, such option designated as "this option" (an existing option, and not a proposed or deferred option), but also by the use of the word "continue," with its unmistakable meaning, as said word is defined in the dictionaries and applied by numerous legal authorities, we have a situation wherein the parties must be deemed to have presupposed or assumed the immediate existence of the option. It is only an existing condition or thing, and not something which has not yet come into existence, which, according to the ordinary, plain and usual meaning of the word "continue," may be continued.

The word "continue" is defined in Webster's New International Dictionary, p. 487, as follows:

1. To remain in a given place or condition; to remain in connection; to abide; to stay.

2. To be permanent or durable; to endure; to last.

3. To be steadfast or constant in any course; to persevere; abide; endure; persist; to keep up or maintain a particular condition, course, or series of actions.

1. To unite; to connect.

2. To protract or extend in duration; to persevere or persist in; to cease not.

3. To carry onward or extend; to prolong or produce; to add to or draw out in length, duration or development.

4. To retain; to suffer or cause to remain.

It will readily be perceived that all the different phases of the definition, and all phases of meaning, of the word "continue" disclose that it presupposes, and relates in its operation, to an existing thing or condition, or to an existing right, obligation, cause of action, law, or other thing.

"To continue" means to keep on. H. F. Wilcox Oil & Gas Co. v. Lewis, 173 Okl. 640, 49 P.2d 782, 786; Bridges v. Koppelman, 63 Misc. 27, 35, 36, 37, 117 N.Y. S. 306, 312, (applying Webster's foregoing definitions).

In Patterson v. Rousney, 58 Okl. 185, 159 P. 636, 639, it is stated, on pages 639, 640:

"Webster defines the word 'continue' to mean:

" '(2) To protract or extend in duration; to preserve or persist in; to cease not; (3) to carry onward or extend; to prolong or produce; to add to, or draw out in length, duration, or development; (4) to retain, suffer, or cause to remain.'

"Giving the word 'continue' the meaning ascribed thereto by Webster, it means that the right to institute an action upon an existing right, contract or claim shall remain or extend or be prolonged the same length of time as if no change had taken place. Had no change taken place the plaintiff's right to institute suit upon the note would have been extended, continued, or prolonged for a period of 5 years from the date it matured, and this construction gives harmony and symmetry to the Constitution, effects the change without confusion, and brings about a result that is just, equal, and right. We are not without legal definition of the word 'continue' to support us in this view. In Williams, Adm'r, v. United States, 154 U.S. 648, 14 S.Ct. 1188, 25 L.Ed. 309, a surgeon in the Continental Army who accepted an appointment in the new regiment of guards authorized by the resolution of January, 9, 1799, was held 'not to continue in service until the end of the war,' within the meaning of the resolution of Congress under which the claim in that case was made, the reason that the service was not continuous but was interrupted and broken by his reenlistment in another branch of the service.

"In Bridges v. Koppelman, 63 Misc. 27, 117 N.Y.S. 306, the sixth paragraph of the syllabus is as follows:

" 'The word "continue," as used in Civil Code Procedure, § 26, providing that a special proceeding pending may be continued from time to time before one or more of the judges of the court, means to keep up, to protract or extend in duration, to extend, or prolong.'

"In Engmann v. Estate of John Immel, Deceased, 59 Wis. 249, 18 N.W. 182, in defining the word 'continue' under a statute providing that payment upon an existing claim shall be sufficient evidence upon a new or continuing contract, said:

" 'The word "continuing," as here used has the natural meaning of perpetrating, protracting, or prolonging from one time to another.'

"It appears that the purpose of adopting the provisions of the Schedule is, as expressed therein, to declare that existing rights, contracts, and claims shall continue as if no change in the form of government had taken place; that is, they shall continue to exist and be capable of enforcement without being liable to be defeated by the plea of limitation for the same period of time they would have thus continued under the laws in force at the time the cause of action accrued."

It will be noted that, among other cases, the supreme court of Oklahoma, in the above excerpt from their opinion, have cited, and quoted from Bridges v. Koppelman, supra.

See, also, numerous other cases referring to, and applying the meaning of the word "continue," cited and digested in vol. 9 Words and Phrases, Perm.Ed., pages 163–167.

The lower court, in holding "that under the terms of the option agreement set forth in paragraph IX of the amended complaint, the plaintiff has no legal right to demand a lease from defendant for the premises described, until the general Peace Treaties have been concluded between the United Nations and the Axis Nations," and "that plaintiff's action in instituting this suit is premature," * * * has adopted the theory of the defendant, which, in effect, is that by virtue of paragraph two of the option the parties, by the word "continue" in the sense in which it was there used, did not assume the then existence of the option, and that its duration merely was being extended or prolonged, but that they intended that the commencement or effectiveness of the option right itself was being deferred or projected into the future—that such right would not come into existence at all until the peace treaties were concluded. That construction does violence to the clear,

plain, ordinary meaning of the word "continue," and virtually substitutes for that word the words "be postponed," so that the option agreement would be, in effect, the same as though the second paragraph of the agreement read:

"In the event that the general war in which the so-called 'United Nations' are at war with the Axis Nations of the world has not been concluded and peace treaties executed at the end of one year, then this option shall be postponed from month to month thereafter until the general treaty of peace has been concluded between the Axis Nations on the one part and the United Nations on the other part."

■ This would be virtually creating a new contract for the parties, which they have not created or intended themselevs, and which, under well-settled rules of construction, the court has no power to do.

■■ The word "postpone" has a meaning that is very different from, and practically opposite to, that of the word "continue," in the sense that the former means to put off or defer the coming into existence of a right, obligation, condition or other thing, whilst the word "continue," as has been pointed out, means to prolong or extend that which is already in existence.

The word "postpone" is defined in Webster's New International Dictionary, supra, at p. 1682, as follows: "To defer to a future or later time; to put off; delay."

In the absence of any sound reason to believe the parties to the option agreement intended the word "continue" to mean "be postponed," it cannot properly be so construed. In the absence of clear evidence of a different intention, words must be presumed to have been used in their ordinary sense, and given the meaning usually and ordinarily attributed to them. See 12 Am.Jur. secs. 227–229, pp. 745–753. In sec. 228, on page 749, it is stated:

"No Right to Make Agreement for Parties—Interpretation of an agreement does not include its modification

or the creation of a new or different one. A court is not at liberty to revise an agreement while professing to construe it. Nor does it have the right to make a contract for the parties—that is, a contract different from that actually entered into by them. Neither abstract justice nor the rule of liberal construction justifies the creation of a contract for the parties which they did not make themselves or the imposition upon one party to a contract of an obligation not assumed. Courts cannot make for the parties better agreements than they themselves have been satisfied to make or rewrite contracts because they operate harshly or inequitably as to one of the parties. If the parties to a contract adopt a provision which contravenes no principle of public policy and contains no element of ambiguity, the courts have no right, by a process of interpretation, to relieve one of them from disadvantageous terms which he has actually made.

"There is no right to interpret the agreement as meaning something different from what the parties intended as expressed by the language they saw fit to employ. The court is not at liberty, either to disregard words used by the parties, descriptive of the subject matter or of any material incident, or to insert words which the parties have not made use of. It cannot reject what the parties inserted, unless it is repugnant to some other part of the instrument. The court can properly interpret a contract only as the parties make it, and cannot substitute words for those used by them. Neither a court of law nor a court of equity can interpolate in a contract what the contract does not contain.

"The court has no power by interpretation to engraft on a contract a limitation inconsistent with the apparent object of the parties. It cannot interpolate a stipulation or words into a contract where such are not implied by anything that appears on the face of the contract and where the surrounding circumstances do not authorize or require a construction of the contract that would

import such stipulation or words into it. It can go no further than to collect the intention from the language employed as applied to the subject matter in view of the surrounding circumstances."

See, also, sec. 236, pp. 758–762.

■ It is our view that there is no ambiguity or uncertainty in the meaning of the language employed in the option agreement executed by the defendant and dated at Reno, Nevada, May 11, 1942, same being above set forth, and hence no room for judicial construction.

There are other well known and generally accepted rules of construction which preclude that adopted by the lower court in sustaining the demurrer. Other rules of construction or interpretation which appear applicable to the situation existing in the instant case are substantially as follows:

■ 1. A contract should be construed, if possible and the same can be done legally, to effectuate valid contractual relations, rather than in a manner which would render same invalid, or render performance impossible.

■ 2. A contract should not be construed so as to lead to an absurd result.

■ 3. A contract should be given a reasonable and fair interpretation. 12 Am.Jur., secs. 250–251, pp. 791–795.

In footnote 12 to the text, on page 793, it is stated: "It is not the duty of a court, by legal subtility, to overthrow a contract, but rather to uphold it and give it effect; and no strained or artificial rule of construction is to be applied to any part of it. If there is no ambiguity and the meaning of the parties can be clearly ascertained, effect is to be given to the instrument used." Citing In re Binghamton Bridge (Chenango Bridge Co. v. Binghamton Bridge Co.) 3 Wall., 70 U.S. 51, 18 L.Ed. 137.

In Williston on Contracts, vol. 11, sec. 620, pp. 1202–1203, it is stated:

"Sec. 620. Secondary Rules: The Instrument Will Be

Construed If Possible So That It Shall Be Effective And Reasonable.

"A construction which makes the contract lawful will be preferred over one which would make it unlawful; a construction which renders the contract valid and its performance possible will be preferred to one which makes it void or its performance impossible or meaningless; a construction which makes the contract fair and reasonable will be preferred to one which leads to harsh or unreasonable results. * * *"

As pointed out by counsel for plaintiff, in appellant's opening brief, on page 8: * * * "If the option may not be legally exercised one year after the date of the contract and any time prior to signing the Peace Treaties, then plaintiff has no rights under the contract because the option is terminated when the Peace Treaties are concluded."

In other words, counsel means that the option would go into effect upon the conclusion of the peace treaties (according to the lower court's construction), and, by force of the limitation of the term or duration of the option (which, in the language thereof, "is until the general treaty of peace has been concluded between the Axis Nations on the one part and the United Nations on the other part," would simultaneously terminate.

The lower court has stated, in the above-quoted paragraph (b) of its written opinion and order, the following: (b) That plaintiff's action in instituting this suit is premature, and no legal obligation exists in defendant to execute to plaintiff a lease for the said premises until the Peace Treaties between the United Nations and the Axis Nations are concluded."

The clear limitation, above quoted, upon the duration of the option, made certain by the use of the word "until," the effect and significance of which is ably presented by plaintiff's counsel, on pages 8 to 10 of his opening brief, precludes the option continuing beyond that same event—the conclusion of the peace treaties.

We are confronted with a construction of the lower court which, in our view, clearly violates the three rules of construction above quoted. It would make of the transaction an idle ceremony. Invalidity, rather than a valid, enforceable contract, would result, because the period of duration of the option would expire before plaintiff could possibly exercise his rights thereunder. And if, by any possibility, the word "after" could be properly interpolated in the option following the word "until" (which we believe the court would have no right or authority to do), then, and in that event, the agreement would, by such construction, be rendered so indefinite and incomplete as to time, that it most likely would be void for uncertainty, having, under such construction, no stipulated or agreed time of duration or termination.

A fixed period in which an option or other similar agreement shall be operative, is essential to its validity; otherwise, it is too incomplete and uncertain to be enforceable.

It is also clear that the construction of the lower court, which would make of the transaction an idle ceremony, leads to an absurd consequence.

And likewise, such construction violates the remaining of the three rules above mentioned, namely, that agreements must receive a reasonable and fair interpretation.

The plaintiff evidently surrendered up, according to the allegations of its amended complaint (and for the purpose of the demurrer those allegations must be taken as true), a lease which, together with the right of renewal, had more than six years to run. And it is alleged, in substance, that at the time the option was given, May 11, 1942, plaintiff's leasehold right and extension or renewal rights thereunder were of the value of $100 per month in excess of and above the rentals payable under said lease, a total difference of more than $7,700 for the period of more than six years and five

months then remaining of the lease and the last renewal period.

Is it reasonable to believe that the plaintiff meant to surrender its leasehold rights of such value, and receive nothing in return, except a mere written option and the dubious pleasure of an idle ceremony? Such an interpretation is neither fair nor reasonable.

■ We might mention, too, that it is contrary to the interpretation placed upon the agreement by the parties themselves.

It is alleged in paragraph X of the complaint, as above stated, that on May 15, 1942 (four days after the option was signed) the defendant rented the premises for a year at a rental of $650 per month, with a provision in the lease that after the expiration of said one-year period the lessee's tenancy would be from month to month. This coincides almost perfectly with the terms of the option. The plaintiff could not exercise the option until the termination of the Harrah lease, at the end of one year. After that, it had the right that its option continue from month to month until the peace treaties were concluded. The defendant, therefore, it appears probable, recognized as effective the continuation from month to month of the option after the expiration of the Harrah lease, that is, after one year, and made its interim rental upon similar terms, so it would be in a position, doubtless, to comply with the terms of the option, should the plaintiff exercise its rights thereunder. The courts properly take into consideration, in interpreting contracts, the interpretation which the parties themselves, by words or actions, have placed upon them. 12 Am.Jur. sec. 249, pp. 787–791.

It may be stated by way of digression that if, as the lower court decided, the option was not to take effect until the peace treaties were concluded, the phrase "from month to month" would be meaningless and entirely inappropriate. There would be no sensible reason to

defer the option "from month to month." It would have been deferred merely until the peace treaties were concluded, had such theory been intended by the parties. As to this phrase "from month to month," the defendant, in his brief, has argued that same would, under the lower court's construction, afford the plaintiff at least until the end of the current month after the conclusion of the general peace treaty, or treaties, in which to exercise the option. We cannot agree with that construction. It is our view that the period of duration of the option is limited by the use of the word "until," and that the phrase "from month to month" could operate merely within the scope of the term or duration of the option, as thus limited.

Now we are confronted with the following question: Did the lower court commit error in sustaining the demurrer upon the ground "that the memorandum agreement set forth in Paragraph IX of said amended complaint is incomplete, uncertain and ambiguous in its provisions, and not capable of being specifically performed?"

The only special demurrer interposed upon the ground of uncertainty is directed merely to the allegation, in the second sentence of paragraph VII of the amended complaint, as to the improvements or furnishings placed upon or in the property, when they were made, their cost and present value. There is nothing in the lower court's order, or decision, indicating that that court was passing upon that special demurrer. The court has decided, generally, that "the memorandum agreement is incomplete, uncertain and ambiguous in its provisions, and not capable of being specifically performed," apparently upon the theory that such incompleteness, uncertainty and ambiguity goes to the extent of making the statement of the cause of action in the amended complaint so defective as to come within the scope of a general demurrer upon the ground that the complaint fails to state facts sufficient to constitute a cause of action.

The lower court has not pointed out wherein the agreement is incomplete, uncertain, or ambiguous, but, in view of the arguments of respective counsel in the briefs, we believe that such ruling is predicated upon the theory advanced by counsel for defendant, to the effect that the option agreement contemplated a lease, the terms of which required future negotiation, and that until all the terms of the proposed lease had been negotiated, developed and agreed upon, there was no completed contract, and hence no basis upon which the court could formulate a decree of specific performance based upon the agreement of the parties.

This presents a question which has been much litigated, and concerning which there is some conflict in the authorities. The authorities very generally, we believe, adhere to the rule that when in the option agreement, or in the negotiations of the parties, there appears the intention that further negotiation shall be had as to the terms of the proposed lease—that there remain questions as to terms and provisions yet to be settled in the future negotiations as contemplated, then and in that event, the proposed lease is incomplete and not yet sufficiently developed upon which to establish the basis of a decree of specific performance.

On the other hand, many authorities take the view that if the option for a lease contains all the essential terms of a simple, ordinary lease, that is to say, the names of the parties, a description of the property to be leased, the amount of rental, when same is payable, and the term or duration of the lease, and does not indicate any expectation of further provisions to be thereafter negotiated, same is sufficiently complete to constitute a binding contract, and to serve as a basis for specific performance—that the usual, ordinary covenants and provisions of leases in the community or vicinity where the property is situated are deemed contemplated by the parties, and further negotiations are unnecessary.

The case of Bennett v. Moon, 110 Neb. 692, 194 N.W. 802, 31 A.L.R. 495, is a leading case adhering to this latter view. An excellent annotation to that case occurs on pages 502 to 511, of 31 A.L.R., in which the learned author has discussed and cited many authorities. We quote from the opinion as same appears, 110 Neb. 692, 194 N.W. 802, 804, 31 A.L.R. 495, on pages 499, 500 as follows:

"This brings us to the real or main matter of controversy in this case, which is that, where the material elements of the agreement to lease are definitely agreed upon, but the contract is silent as to the general, usual and ordinary covenants and conditions, can such a contract be enforced by specific performance? In other words, are these covenants and conditions to be implied in law, or must they be definitely set forth in the agreement in order to be inserted in the lease by decree of a court of equity? While the contract provides 'that a lease shall be executed covering the agreement between the parties hereto as to said building,' it is silent as to the usual conditions, covenants and other general provisions contained in an ordinary lease.

"From an examination of the recognized text-books and the adjudicated cases, it appears that it has long since been the settled law that, where there is no specification in the contract to execute a lease covering the usual and ordinary covenants and provisions, these will be implied by the courts of equity. This rule was established in England as early as the famous decision in Dumpor's Case, and is clearly stated in Church v. Brown, 15 Ves.Jr.(Eng.) 258, 271, [33 Eng.Reprint, 757, 15 Eng. Rul.Cas. 688], in this language: 'There was no sort of a difference whether the agreement in the terms of it did or did not refer to usual or proper covenants; that in every agreement, whether as to freehold or leasehold estate, it was implied that there were to be usual and proper covenants.'

"This rule of law is recognized, with some exceptions, by the courts of this country. In 36 Cyc. 792, the general principle of construction is briefly stated thus: 'A contract to execute a lease calls for a lease with the usual covenants.'

"The annotator of the L.R.A. states the rule to be: 'Specific performance of an agreement for a lease will be decreed with such covenants as are usual and incident to leases of the same kind, and such as flow from the contract and are necessary to give it effect.' Note in 20 L.R.A. 36.

"The same principle of law is announced in Eaton v. Whitaker, 18 Conn. 222, 44 Am. Dec. 586, in which the court say: 'Where nothing was said as to its terms, at the time when the agreement was made,' the decree will require the demurring party 'to execute a lease containing the usual provisions.' "

The rule so ably set forth in Bennett v. Moon, supra, and which, as therein stated, was established in England as early as the famous decision in "Dumpor's Case," we believe has been followed very generally, both in England and in the United States. This rule excludes from its operation and effect all cases in which the agreement, or negotiations in connection therewith, indicate that the parties contemplated future negotiations and agreement as to the provisions of the proposed lease.

We realize that there are some cases, however, including certain authorities cited by defendant, which are not distinguishable from the doctrine in Bennett v. Moon, because of the foregoing exception, and which do not agree that, in the absence of any indication in the agreement that future negotiations are contemplated, that the "usual or ordinary covenants" in the particular locality shall be deemed implied by equity in the proposed lease. Some of these authorities do not consider the term "usual or ordinary covenants" sufficiently certain to afford the basis for a decree of specific performance, contending that there is no criterion by which to determine

what are and what are not usual and ordinary covenants in a particular community.

In Jones on Landlord and Tenant, the distinguished author, in sec. 137a, pp. 170, 171, has stated:

"Sec. 137a. What Constitutes a Valid Agreement.— Under the authorities, to create a valid contract of lease, but few points of mutual agreement are necessary: First, there must be a definite agreement as to the extent and bounds of the property leased; second, a definite and agreed term; and third, a definite and agreed price of rental, and the time and manner of payment. These appear to be the only essentials. If the parties are fully agreed, there is a binding contract, notwithstanding the fact that a formal contract is to be prepared and signed; but the parties must be fully agreed and must intend the agreement to be binding. From the very nature of such an agreement, it is obvious that the parties contemplate the execution of a more formal instrument which may contain additional details as to the terms of the demise and the rights and obligations of the parties. The mere fact that a written lease was in contemplation does not relieve either of the contracting parties from the responsibility of a contract which was already expressed in writing and a valid agreement for a lease may be made by letters and telegrams. When one party refuses to execute the lease according to the contract thus made, the other has a right to fall back on the written propositions as originally made. The absence of the formal agreement contemplated is not material.   *   *   *"

The option agreement involved in the instant case contains all the essential elements prescribed in the rule as set forth by Mr. Jones, and in Bennett v. Moon, supra, with the possible exception of an item as to when and in what manner the rental shall be payable, but the rental was undoubtedly intended to be paid in the manner and at the time conforming to the customary course of dealing between the parties under the original lease dated

the 29th day of October 1934, and the several renewals thereof.

This brings us to the question or proposition as to the effect which the previous course of dealing of the parties in the matter of the agreed provisions of the said original lease and the renewals thereof should have in relation to the determination of whether or not those provisions may be fairly implied and deemed contemplated by the parties in connection with the option of May 11, 1942. It has been pointed out that the doctrine in Bennett v. Moon, supra, and of the many other authorities expounding similar views, is that equity, in the absence of any showing of a contrary intention, will presume that the parties intended, if their agreement contains the principal essentials of a lease, that the provisions and covenants usually employed in the community where the property is situated shall be deemed impliedly incorporated in the proposed lease. But in the instant case, the question arises of whether or not, as to the lease proposed or contemplated by the option, the provisions of the original lease of October 29, 1934, as renewed, shall be implied, because actually settled and agreed upon by the parties, and repeatedly adhered to in their previous course of dealing. This sort of implication of provisions comes under the classification of agreements or contracts implied in fact, as distinguished from those implied by law or equity. If the foregoing proposition of whether or not the parties actually intended that the provisions of the original lease, as renewed, should be implied, in the option as to the proposed lease of a portion of the term provided by the last renewal of the original lease, be answered in the affirmative, it will be unnecessary for us to determine in the instant case whether or not this court should follow and apply the doctrine enunciated in Dumpor's case, Bennett v. Moon, supra, and the cases adhering to that doctrine. If we should determine that the transaction whereby plaintiff

received the option of May 11, 1942, was merely tantamount to a reservation or retention by plaintiff of a portion of the term of the original lease as last renewed, it is obvious that if a portion of the term of the lease is retained or reserved, all its parts, including its provisions and covenants, are likewise retained and reserved. And the criterion by which to determine the appropriateness of the proposed lease submitted to defendant in May 1946, for execution, and the correctness of defendant's action in refusing to execute such lease, would be whether or not the provisions thereof were identical with the provisions of the original lease as renewed, and not the question of whether or not the covenants and provisions of the tendered form of lease were usual or customary in the community. In determining the question of whether or not the provisions and covenants of the original lease as renewed shall be deemed implied in fact, by virtue of the intention of the parties in connection with the option of May 11, 1942, the principal inquiry should be: What was the intention of the parties?

The original lease of October 29, 1934, had been extended, or renewed, by the parties three times prior to the option agreement of May 11, 1942, and such extensions or renewals were invariably upon the same terms and conditions as embodied in the original lease, according to the allegations of the amended complaint, which must be taken as true. The first of those renewals or extensions was from October 29, 1934, to October 26, 1937; the second from October 26, 1937, to October 26, 1940, the third from October 26, 1940, to October 26, 1943. And, by agreement made November 25, 1939, defendant gave plaintiff an option to renew or extend the lease to October 26, 1948, an extension of five years. On May 11, 1942, the date of the option involved in the instant case, the plaintiff, Reno Club, Inc., was in possession, under the renewal of its lease to October 26, 1943.

Thus the plaintiff had one year and more than five months as yet unexpired on the last renewal of its lease, and had, also, the said option for an additional renewal of five more years, a total of more than six years and five months. It is alleged in the amended complaint, as has already been stated, that the rental value of the leasehold rights of plaintiff on the date of the option was at least $100 per month in excess of the rental provided by plaintiff's lease, and in four days after plaintiff surrendered the lease, May 15, 1942, the defendant rented the premises for $650 per month. By virtue of the surrender of the remainder of its lease and of its option for renewal to October 26, 1948, the plaintiff was yielding up an excess value, or profit, of at least $7,700, under the estimate of excess value, and more than $23,000 if figured upon the basis of the rental paid by plaintiff's immediate successor in the tenancy. The plaintiff, apparently, was unwilling to yield up so valuable an asset unconditionally and gratuitously; and yet, due to the war, was not at that time desirous of continuing active operations. It is reasonable to infer that the plaintiff therefore required, in consideration of yielding up its valuable lease and option for renewal, that it receive back an option for a portion of the term it was surrendering up, such portion to be the portion of the term of the original lease (as extended) remaining from the date subsequent to the end of the Harrah lease (one year from date) upon which it should elect to exercise its said option, and to October 26, 1948. It is significant that the terminal date of the proposed lease under the option of May 11, 1942, is identical with the date of the termination of the last renewal period of the original lease of October 29, 1934. "Equity regards the substance and not the form," is an ancient maxim of equity jurisprudence, venerable, and cherished not alone because of its maturity, but also by reason of its proven value as an instrumentality contributing to the accomplishment of real justice and equity, unhampered by too great adherence to technicality. The plaintiff being the owner of the unexpired lease

of October 29, 1934, as extended, and of the option for renewal to October 26, 1948, and both parties being satisfied with the terms thereof, as evidenced by their repeated prior renewals under the same terms and conditions, plaintiff undoubtedly was unwilling, as before indicated, to give up all its right to the premises, but wished to reserve, or retain, an option upon the portion of the term above specified.

Regardless of the fact that, in form, the option did not expressly reserve or retain such portion of the term and renewal period, it was in substance to that effect, in view of the background and evident intention of the parties. It amounted to an agreement that, under the conditions set forth therein as to time of taking effect, amount of rental, etc., there should be restored to plaintiff, at its option, such portion of the term of the last renewal of the original lease as remained at the time plaintiff should elect to exercise the option. Under the maxim that equity regards the substance and not the form, it makes little difference whether there was a formal surrender agreement with an express reservation in the same instrument of a portion of the term of the surrendered lease, or two separate instruments, a surrender agreement and a separate option, or merely a surrender by delivery of the old lease and option for renewal, and a written option back whereby the optionee could have restored to him a portion of the term. In either event, it would be, in effect, the retention at its option, by plaintiff, of a portion of the term of the surrendered lease with its identical provisions and covenants, except as expressly changed in the option agreement.

It is reasonable to believe that this theory was agreeable to the defendant. As has been pointed out, defendant had repeatedly extended and renewed the original lease of October 29, 1934, upon the same terms embodied therein. It is also reasonable to believe that the changes expressed in the option agreement were all the modifications of the original terms which defendant desired, or same would have been expressed in the option. We

believe it is fair to imply in fact, therefore, that, in connection with the option of May 11, 1942, both parties thereto intended that all terms and conditions of the original lease of October 29, 1934, and of the unexpired renewal thereof executed November 25, 1939, should apply as between the plaintiff and defendant in relation to that portion of the term of the last renewal lease which the option agreement provided, in effect, should be restored to plaintiff upon its exercise of its rights thereunder, except as to the provisions changed expressly by the terms of the option. The plaintiff, in its amended complaint, has alleged that the proposed lease tendered by the defendant in the month of May 1946 contained identical covenants and agreements contained and set forth in the original lease of October 29, 1934 (and which lease, as has been shown, plaintiff surrendered to defendant May 11, 1942), except as to the amount of rental charged, the term thereof, and the absence of the right of renewal. These allegations, for the purpose of the demurrer, must be taken as true.

For the reasons stated and indicated, we are convinced that the amended complaint states facts sufficient to constitute a cause of action, and that the memorandum agreement set forth in paragraph IX of the amended complaint is not incomplete, uncertain, or ambiguous. If it should develop at the trial that the tendered lease contains any provisions or covenants not included in the original lease of October 29, 1934, such provisions or covenants should be, and undoubtedly would be, rejected and not embraced within the trial court's decree. Our view being that the demurrer should have been overruled, and that the decision and order of the district court in sustaining same was unreasonable, unjustifiable and clearly wrong, and if upheld by this court would result in a grave injustice to the plaintiff, reversal is inevitable. It is, therefore, ordered that the judgment of the district court be, and the same is hereby, reversed, and the cause remanded with instructions to that court to enter its order overruling defendant's demurrer to

plaintiff's amended complaint, and allowing defendant such time to answer as the district court may deem appropriate.

BADT, J., concurs.

EATHER, C. J., because of illness, did not participate in the preparation and rendition of the foregoing opinion.