JOHN C. SERPA, APPELLANT, *v.* MICHAEL DARLING, MURIEL H. DARLING AND DARLING PROPERTIES CORPORATION, A NEVADA CORPORATION, RESPONDENTS.

No. 20464

April 30, 1991 810 P.2d 778

*Crowell, Susich, Owen & Tackes,* Carson City; *Laura Wightman FitzSimmons,* Las Vegas, for Appellant.

*Allison, MacKenzie, Hartman, Soumbeniotis & Russell,* and *Mark Amodei,* Carson City, for Respondents.

## OPINION

By the Court, YOUNG, J.:
Respondent Michael Darling owned several parcels of land

known as the Empire Ranch, located adjacent to the Carson River in Carson City. In 1979, Darling subdivided part of the ranch into a planned unit division, or PUD. During the late summer and early fall, the appellant Serpa and Darling entered into negotiations regarding the purchase of Darling's property.

On September 24, 1985, the parties signed a Letter of Intent wherein they agreed to "bargain in good faith in connection with negotiating a final agreement" for the purchase and/or option to purchase Darling's property. The Letter of Intent stated that it would "continue in effect for a period not to exceed 30 days."

The parties continued negotiations and, on December 16, 1985, executed several documents that superseded the Letter of Intent, including the following: a Master Agreement; purchase and sale agreements of the PUD; an option to purchase effluent lands; an option to purchase water rights; and an Addendum to the agreement. The Master Agreement does not incorporate the other agreements but does refer to them.

Under the option agreements, Serpa had ninety days from the date of execution to pay Darling the total sum of $140,000 for the two options "in consideration for Darling granting to Serpa the option to purchase . . . ." Additionally, annual option payments totaling $100,000 were due one year from the date of execution. The combined purchase price for the effluent option and the water rights option was $1,240,000, with each payment to be applied against the total purchase price. The option periods were seven years; if Serpa failed to exercise the options, Darling would retain all payments.

The Addendum provided that Serpa had ten days to approve of the preliminary title reports and the status of five other listed items, and that, if Serpa objected to any of the items, Darling was to "use due diligence to resolve such objections at his own expense before close of escrow."

On December 26, 1985, ten days after the execution of the above agreements, Serpa's attorney, Bill Crowell, delivered to Darling's attorney, Scott Heaton, a letter (Letter of Exceptions) concerning the objections contained in the Addendum.

An escrow was opened on February 14, 1986, and the sale of the PUD to Serpa was closed on March 24, 1986. The parties continued to negotiate during this time as to the option agreements. On February 21, 1989, the parties executed a Memorandum of Agreement concerning the sale of the PUD. This Memorandum also provided that, if Serpa failed to pay Darling for the PUD, the option agreements would be rendered null and void.

On March 17, 1986, the initial option payments of $140,000

were due to Darling from Serpa pursuant to the option agreements allowing for ninety days. Darling made no demand on March 17, 1986, for the initial option payments.

On April 10, 1986, Serpa wrote to Darling and informed him that he would deposit

> the full $140,000 on the options with releases of $50,000 as soon as we agree what is to be settled on with Scott Heaton and Bill Crowell as the final written agreement. Another $50,000 when the items in Scott Heaton's letter of 3/31/86 are meet [sic] (pages 1 & 2) and the final $40,000 when items on page 3 are settled. I also believe Sierra Land Title Co. should hold title to items in each option until they are paid for in full and can be transfered [sic] to myself.

Serpa deposited three checks totalling $140,000 with Sierra Land Title Co. shortly thereafter. In order to receive the money, Darling had to go to the title company and sign instructions (agree to conditions) for the options. An escrow was never opened for the option properties.

On April 16, 1986, Heaton wrote a letter to Crowell noting that the $140,000 in option payments was due on March 17, 1986, and requesting payment. One week later, Crowell wrote to Heaton and expressed continued frustration with Darling's progress in satisfying the exceptions and offered an outright purchase of the option properties.

The parties apparently attempted to negotiate an outright purchase of the option properties but no agreement was ever reached.

Darling continued to exercise "due diligence" to satisfy Serpa's objections until July 14, 1986, when Darling wrote to Serpa, through Crowell, and informed him that the option period had expired on March 17, 1986, due to non-payment. However, the letter extended the period until August 1, 1986, and stated that Serpa had until that date to exercise the options for the properties on an "as is" basis. It also indicated that the period of "due diligence" was over.

On August 1, 1986, Crowell wrote to Andrew MacKenzie, Darling's new attorney, and demanded performance by Darling to remove the objections from the option properties, stating that "[t]here is no agreement in existence that requires us to take the property where is and as is . . . ."

On November 19, 1986, MacKenzie wrote to Crowell informing him that, because Serpa failed to timely close the escrow (exercise the options), the agreement to purchase the option properties was terminated. Serpa then responded with a threat to

pursue legal action and, on January 8, 1987, filed a notice of lis pendens.

After a bench trial, the district court concluded that no contract existed between Serpa and Darling because the Addendum provided that Serpa was not bound until he approved of the conditions in the Addendum. The court also found that, because Serpa failed to exercise the options by tendering payment to Darling, Serpa was precluded from seeking enforcement of Darling's performance under the option agreements.

Appellant first contends that the district court erred in concluding that the Addendum attached to the December 16, 1985, agreements made them unenforceable because it made appellant's obligation to perform contingent upon his approval of the six items listed in the Addendum. The district court reasoned that the items in the Addendum acted as conditions precedent to the existence of a contract. We conclude that, because the instant agreements were supported by neither mutuality of obligation nor consideration, the district court was correct in its determination that the agreements are unenforceable.

We have previously stated that "[m]utuality of obligation requires that unless both parties to a contract are bound, neither is bound." Sala & Ruthe Realty, Inc. v. Campbell, 89 Nev. 483, 487, 515 P.2d 394, 396 (1973). While a lack of mutuality of obligation in an option contract may be cured by the presence of consideration, in this case neither mutuality of obligation nor consideration was present. The language of the agreements themselves is clear and unambiguous as to the requirement of consideration. We therefore reject appellant's assertion that the execution of the PUD contract acted as consideration for the option agreements. *See* Club v. Investment Co., 64 Nev. 312, 323, 182 P.2d 1011, 1016 (1947).

Furthermore, we note that appellant requests specific performance of the option agreements. Not only do the conditions and failure to tender consideration prohibit formation of a valid contract, we note that the conditions outlined in appellant's December 26, 1985, Letter of Exceptions exceed the scope of the conditions as detailed in the parties' December 16, 1985, Addendum to the agreements. This persuades us that the option agreements cannot be enforced since the parties themselves failed to agree upon the terms.

Appellant next contends that the agreements were not severable

because the purchase and sale agreement of the PUD was contingent upon the conditions relevant to the options as laid out in the Addendum. While the Master Agreement does refer to both the option properties and the PUD, it does not incorporate the option documents. Furthermore, the PUD purchase was completed. Escrow on the PUD was opened and closed, while the exercise of the option properties could have been delayed for seven years. This segregated performance of the PUD from the non-exercised option agreements constitutes evidence of severable contracts. *See* Dredge Corp. v. Wells Cargo, Inc., 82 Nev. 69, 73, 410 P.2d 751, 754 (1966) ("A contract is divisible where, by its terms, performance of each party is divided into two or more parts . . . .").

Additionally, the language of the agreements creates severable agreements: the option agreements make no reference to the Master Agreement or to the purchase and sale agreement of the PUD. As for the subject matter of the agreements, the purchase and sale agreement involved the PUD, whereas the option agreements involved effluent lands and water rights. "Whether a contract is entire, or separable into distinct and independent contracts, is a question of the intention of the parties, to be ascertained from the language employed and the subject-matter of the contract." Sprouse v. Wentz, 105 Nev. 597, 605, 781 P.2d 1136, 1140 (1989) (quoting Linebarger v. Devine, 47 Nev. 67, 72, 214 P. 532, 534 (1923)).

Finally, appellant contends that specific performance of the option agreements should be awarded. Not only is enforcement of a nonenforceable contract impossible, we have previously stated that "the decision to either grant or refuse specific performance is addressed to the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is shown." McCann v. Paul, 90 Nev. 102, 103-104, 520 P.2d 610, 611 (1974). *See also* Carcione v. Clark, 96 Nev. 808, 618 P.2d 346 (1980).

To be awarded specific performance, a purchaser who has not tendered the purchase price must demonstrate that she is ready, willing, and able to perform. Cohen v. Rasner, 97 Nev. 118, 624 P.2d 1006 (1981). Appellant was not ready and willing to perform because tender of the option monies was never effectuated. We find appellant's argument that a valid tender was made by placing checks at the title company unpersuasive since respond-

ent had to satisfy conditions in order to secure release of the money and these checks were not placed in escrow.

Specific performance is available only when: (1) the terms of the contract are definite and certain; (2) the remedy at law is inadequate; (3) the appellant has tendered performance; and (4) the court is willing to order it. *Carcione,* 96 Nev. at 811, 618 P.2d at 348. Even if we were to conclude that the agreements between the parties were enforceable and that appellant tendered performance, we do not find the terms of the parties' agreement to be sufficiently definite and certain to allow specific performance.

We conclude that the district court did not err in finding that the agreements were unenforceable and in quieting title in Darling. We therefore affirm the judgment of the district court.

MOWBRAY, C. J., and STEFFEN, J., concur.

ROSE, J., dissenting, with whom SPRINGER, J., agrees:

The parties entered into eight agreements for the sale of Darling's ranch to Serpa. The district court concluded that the agreements were severable and that, because of language in an addendum, the other contracts were made illusory and therefore unenforceable. Since both of these findings are erroneous, I cannot join in affirming the lower court's decision.

When several contracts are executed, an initial determination often must be made as to whether the contracts are to be viewed as a whole or as individual, severable agreements. In doing this, this court will make an independent review of the contracts and, if necessary, testimony surrounding their execution to determine the intent of the parties. As we stated in Sprouse v. Wentz, 105 Nev. 597, 781 P.2d 1136 (1989):

> Whether two agreements constitute a single, inseverable contract or two separate contracts is a question of law. Linebarger v. Devine, 47 Nev. 67, 72, 214 P. 532, 534 (1923); Bethea v. Investors Loan Corp., 197 A.2d 448 (D.C.App. 1964). We have announced that '[w]hether a contract is entire, or separable into distinct and independent contracts, is a question of the intention of the parties, to be ascertained from the language employed and the subject-matter of the contract.' *Linebarger,* 47 Nev. at 72, 214 P. at 534.

105 Nev. at 605, 781 P.2d at 1140. Our first task is to determine the parties' intent in executing the contract—was it essentially for

the sale of various parts of the ranch separately with each agreement to be independent of the other, or were the contracts intended as a sale of the entire ranch, but contained in a number of documents?

Serpa was interested in purchasing Darling's entire ranch. The parties initially executed a document entitled "Letter of Intent," which stated that each would negotiate in good faith to "option" the entire ranch to Serpa for about three million dollars. As the parties entered into negotiations to finalize the ranch sale, the intent was to accomplish the sale or option to sell to Serpa the entire ranch.

Darling insisted on retaining the headquarters portion of the ranch and Serpa acceded to this. The parties then agreed that the remaining ranch would be available to Serpa in three segments through agreements to purchase or options to purchase. First, there was a planned unit development (PUD) area, that Darling had created. Second were the water rights to the property, and third was the land that received effluent pursuant to a contract with Carson City. However, prior to and during the negotiations, Serpa insisted that he did not want the PUD without the other two segments because he felt the water rights and effluent contract were more valuable and necessary for the final development of the ranch as a whole.

After negotiations, the parties entered into eight agreements for the sale of the ranch to Serpa, with the sole exception of the ranch headquarters. The first was entitled Master Agreement and it was to "memorialize" the parties' intentions. It then referred to the other agreements that dealt with the sale or option of the three specific portions of the ranch.

After reading the Letter of Intent and the eight agreements, there is no doubt that the parties intended the sale to be for the entire ranch and the agreements were not divisible. And if there was the slightest doubt, it was removed by the testimony of Darling's own attorney, Scott Heaton, who prepared the agreements. He stated that "[i]t was always my understanding that all of these agreements were integrated documents, that none of them stood by themselves" and that this was the intention of the parties.

In *Sprouse,* the parties entered into agreements to exchange their ranches and cash. Subsequently, the parties entered into other agreements for the exchange of livestock by sale or option to purchase. The district court held that the livestock agreements were severable from the agreements for the sale of land. But upon independent review, this court determined that the land and livestock sales were intended by the parties to be interdependent and integrated, and therefore not severable.

If the agreements in *Sprouse* were not severable, the agreements in this case, executed at the same time and dealing with the sale of one ranch, certainly are not. The record establishes, at least by a preponderance of the evidence, that the agreements were to accomplish the sale or option of the entire ranch to Serpa and that they were interdependent and integrated, not severable.

The second error I believe the district court made was in concluding that the addendum to the seven agreements made them illusory and therefore unenforceable. The reason for such a conclusion was that the agreement gave Serpa the opportunity to review the status of the property and water rights and he could eventually terminate the contract if his objections were not eliminated. While this issue presents a closer question, I do not think the addendum rendered the contracts conditional or made the seven preceding agreements unenforceable.

When the parties met to execute the agreements which Darling's attorney had prepared, Serpa realized that there were a number of loose ends that had not been finalized. He had not received a preliminary title report to see if title was as Darling represented, there was uncertainty as to the status of Darling's contract and subsequent negotiations with Carson City regarding the effluent, and the open area designation by Carson City on the PUD property had to be confirmed. Therefore, an addendum was added to the previously prepared agreements addressing these concerns, and it was executed by the parties along with the other agreements. The addendum provided that Serpa would have ten days to approve the status of those areas of concern. If Serpa had any objections, Darling was to use due diligence to eliminate them. If he could not, Serpa would then have the opportunity to elect to terminate or purchase, subject to such objections.[1]

---

[1]Specifically, the clause stated as follows:

The undersigned hereby agree as follows:

Buyer shall have a period of ten (10) days from the date hereof to approve the following:

1. The Preliminary Title Reports for all subject properties;

2. The status of the PUD property, particularly the open area designation and any other conditions existing as of the date hereof;

3. The status of the water rights;

4. The status of the real property taxes, particularly any deferred taxes;

5. The number and status of the existing PUD lots;

6. The status of all effluent negotiations and agreements between the Seller and Carson City.

Seller to furnish Buyer a written statement of status.

If Buyer objects to any of the foregoing items, Seller shall use due diligence to resolve such objections at his own expense before close of escrow.

If such objections cannot be resolved before close of escrow, all

The district court held that the provision giving Serpa the right to object to certain information and then terminate the agreements if the objections were not removed made the entire sale conditional and, in effect, gave Serpa an option to cancel. In reaching this conclusion, the court relied on Sala & Ruthe Realty, Inc. v. Campbell, 89 Nev. 483, 515 P.2d 394 (1973).

In *Sala,* a real estate broker sued for a commission he believed he earned when the owner of a motel entered an offer and acceptance agreement with a prospective purchaser, but conditioned the purchase on the buyer's approval of an inventory and accounting within ten days from the date of the offer. We held that this approval clause was a condition precedent to the existence of a contract and made the buyer's promise illusory because he was not obligated to perform. While *Sala* is somewhat persuasive for the plaintiff, I do not think it is factually the same as this case or controlling.

Serpa was given the right to object to any liens or other problems with the preliminary title report and with the status of the water rights, the effluent contract with Carson City, and the PUD property. In the agreement and options, Darling had warranted that he had clear title to the property and that his water rights and effluent contract with Carson City were as represented. The addendum was merely to give Serpa the opportunity to check and see if the representations made by Darling were correct. And if Serpa objected, Darling was given the opportunity to satisfy the problem or cure the objection. Only if Darling failed to remove or cure the objection could Serpa terminate the agreements. This factual situation is easily distinguishable from that of *Sala* and the addendum did not make the agreements and options illusory.

I find this case more akin to those where an agreement is conditioned upon a specific event, performance or status being met to the buyer's satisfaction. *See* Jenkins Towel Service, Inc. v. Tidewater Oil Co., 223 A.2d 84 (Pa. 1966) (contract for sale of real property contingent upon vendors obtaining curb cut permit satisfactory to purchaser); Converse v. Fong, 205 Cal.Rptr. 242 (Ct.App. 1984). And in Parsons Drilling, Inc. v. Polar Resources, 98 Nev. 374, 649 P.2d 1360 (1982), we held that where a buyer was given the option to terminate the contract by

rights and obligations hereunder may, at the election of the Buyer, terminate unless Buyer elects to purchase the property subject to such objections.

In all escrows between the parties, the following terms shall prevail:
1. Seller shall furnish title insurance at his cost, together with paying the documentary transfer tax for any deeds;
2. The remaining costs and expenses of escrow, excluding survey costs, quiet title actions, and the like, shall be divided and paid equally.

returning the purchased rig, the exercise of such contractual right to terminate was enforceable. We reached this result by concluding that the seller had no right to claim rent for the time the rig was used because this was not an equitable rescission of a contract, but rather a contractual termination. I see little difference between the right to terminate in the *Parsons* case and the case at bar.

Because I believe the district court erred in reaching the two conclusions as I have stated, I would reverse the judgment and remand the case for a new trial.