65 F.3d 174
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
EMPIRE VENTURES, INC., a Colorado corporation, Plaintiff-Appellee,
v.
Hugh Roy MARSHALL, Defendant-Appellant.
 No. 94-15133.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 12, 1995.
Decided Aug. 23, 1995.
 
 1
 Before: HALL, WIGGINS, LEAVY, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 OVERVIEW
 
 3
 Hugh Roy Marshall ("Marshall") appeals the district court's order of specific performance in this diversity action, brought by Empire Ventures, Inc. ("Empire") for breach of a contract for the sale of land.[1] Marshall, the buyer, refused to complete the purchase; he claimed that Empire, the seller, had failed to deliver acceptable proof of ownership as required by the contract. The district court found that Marshall had accepted Empire's proof of ownership and that Empire was entitled to specific performance of the contract. Marshall appealed, and we affirm.
 
 BACKGROUND
 
 4
 Marshall is the sole stockholder, director and president of Marshall Earth Resources, Inc. ("MERI"), a Texas corporation. In the early 1980s, Marshall became interested in acquiring, on behalf of MERI, property in Storey County, Nevada, that was owned by Comstock Lode Mines, Inc. ("CLM") and held by Empire under a 99-year lease. Marshall retained the law firm of Hill, Cassas & DeLipkau to provide title searches, reports and opinion letters in connection with the property. The Hill, Cassas reports, completed in February 1986, called attention to three potential title problems, dubbed the "town site," "Sutro Tunnel," and "survey" problems.
 
 
 5
 On May 6, 1986, Empire and MERI entered into an exploration and option agreement ("exploration agreement") giving MERI the right to explore the property for mining purposes and the option to purchase Empire's leasehold interest in the property. MERI took possession of the property and conducted mining exploration work. The exploration agreement expired on April 1, 1990.
 
 
 6
 MERI did not exercise the option to purchase Empire's leasehold interest. Instead, MERI told Empire that MERI wanted to purchase both Empire's and CLM's interests in the property. MERI requested Empire to acquire CLM's interest so Empire could transfer CLM's ownership interest as well as Empire's leasehold interest to MERI.
 
 
 7
 On April 2, 1990, Marshall and Empire entered into a sales agreement, which became the subject of this action. The property referred to in the sales agreement is the same property covered by the exploration agreement. The sales agreement provides, in pertinent part:[2]
 
 
 8
 1. Extension of Exploration Agreement; Payment of $60,000. Upon receipt of proof, acceptable to MARSHALL and his advisors, (a) that CLM owns the Property free and clear of all liens and encumbrances; (b) that CLM is obligated to sell the Property to EMPIRE; (c) that EMPIRE has the right to purchase the Property or has purchased the Property; and (d) that EMPIRE can convey the Property to MARSHALL, MARSHALL shall pay EMPIRE sixty thousand dollars ($60,000) to extend the right to explore under the ... Exploration Agreement, through January 7, 1992.
 
 
 9
 2. Binding Agreement to Purchase. This Agreement constitutes MARSHALL's binding, specifically enforceable agreement to purchase the Property, subject only to the provisions of Paragraph 1 above.
 
 
 10
 On October 18, 1990, the $60,000 required by the extension agreement was reduced to $45,000 because Marshall would need to do a survey of the property. At the same time, the January 7, 1992 expiration date was changed to May 15, 1991.
 
 
 11
 On December 11, 1990, Empire delivered to Marshall a stack of title documents assembled by an abstractor. On January 11, 1991, Marshall paid the $45,000.
 
 
 12
 For some time thereafter, discussions on remaining issues progressed smoothly. Marshall's title attorney, Ed Hollingsworth, compared the title documents received on December 11 to the property description in Empire's proposed deed. He found numerous discrepancies, which were corrected to the satisfaction of both parties.
 
 
 13
 Shortly thereafter, Marshall decided not to go through with the deal. He failed to pay the first installment of $1,400,000 into escrow as provided in the sales agreement. At that time, he raised the town site, Sutro Tunnel, and survey problems as objections to Empire's title. Empire sued Marshall for specific performance.
 
 
 14
 The district court made the following findings. Marshall had had full knowledge of the title problems at all times, and, having accepted the benefits of the extension agreement with such knowledge, was estopped from asserting those problems as a ground for not accepting Empire's proof of ownership. Empire held title to and at all times material to this action was able to convey to Marshall the property described by the deed approved by Hollingsworth. Empire was ready, willing and able to execute the deed and convey title in accordance with the sales agreement. Marshall refused to continue with the purchase because of cash flow problems, not because he was dissatisfied with the existing state of title to the property. Marshall's refusal to make payments as required under the sales agreement constituted a breach, and Empire was entitled to specific performance.
 
 DISCUSSION
 
 15
 I. THE SALES AGREEMENT WAS NOT VOID FOR LACK OF CONSIDERATION
 
 
 16
 Marshall contends that no enforceable agreement was reached because the sales agreement gave Marshall unfettered discretion to reject proof of ownership. Empire points out, correctly, that this issue was waived.
 
 
 17
 Unenforceability of the contract is an affirmative defense to a breach of contract action. See Williams v. Cottonwood Cove Dev., 619 P.2d 1219, 1220 (Nev.1980). As such, under federal procedural rules, it is waived if not asserted in the answer. See Fed.R.Civ.P. 12(b). Marshall's answer does not deny the enforceability of the contract, but rather admits that he "executed" the "agreements." The pretrial order mentions that whether Marshall had complete discretion to accept or refuse proof of ownership was an issue of law for trial, but the order nowhere mentions the possibility that the contract might be unenforceable. Unenforceability was first mentioned in Marshall's proposed findings of fact and conclusions of law; this is insufficient to cure his previous waiver.
 
 
 18
 II. THE DISTRICT COURT DID NOT ERR IN FINDING THAT MARSHALL ACCEPTED EMPIRE'S PROOF OF OWNERSHIP
 
 
 19
 The district court determined that Marshall had accepted the proof required by the sales agreement. Marshall challenges this determination.
 
 
 20
 The sales agreement, executed on April 2, 1990, stated that: "Upon receipt of proof, acceptable to [Marshall] and his advisors, ... [Marshall] shall pay [Empire] sixty thousand dollars." The $60,000 figure was later reduced to $45,000, and Marshall paid it on January 11, 1991. The district court found: "In making the [$45,000] payment to Empire, Marshall accepted the proof required by the sales agreement except to the extent the parties agreed that the property description to be used in the transaction would be that as determined by counsel for the defendant, Ed Hollingsworth." Marshall later found the property description acceptable. Therefore, the district court concluded, acceptance of the proof was complete.
 
 
 21
 The parties do not dispute the fact that Marshall paid the $45,000 under the extension agreement. At issue is the legal import of the payment. Whether or not the payment constituted an acceptance or waiver of proof is a question of law reviewed de novo based on the facts found by the district court, which are reviewed for clear error. See Duran v. Housing Auth., 761 P.2d 180, 183 (Colo.1988) ("Where the material facts are not disputed, the determination of whether there has been a waiver is a matter of law.").
 
 
 22
 The language of the sales agreement ("Upon receipt of [acceptable] proof ... Marshall shall pay") indicates that acceptable proof was a condition precedent to Marshall's obligation to pay the specified sum. Conditions precedent may be waived. Reno Realty & Inv. Co. v. Hornstein, 301 P.2d 1051, 1054 (Nev.1956); Restatement, Second, Contracts Sec. 84 cmt. d (1979). "In contract, waiver as a matter of law may occur when the contract establishes that an obligation by one party is a condition precedent to that of the other, and it is undisputed that the latter has proceeded in spite of the former's failure to fulfill the condition." Richmond v. Grabowski, 781 P.2d 192, 194 (Colo.Ct.App.1989). Under this rule, when Marshall paid the $45,000 despite his alleged failure to receive acceptable proof from Empire, he waived his right to insist on further proof.[3]
 
 
 23
 Marshall contends that his acceptance of proof of ownership was a condition precedent to the sale itself, not to the $45,000 payment, which was intended merely to extend the exploration agreement while the parties worked out satisfactory title. Although there is some parol evidence to support Marshall's interpretation,[4] the parol evidence may not be considered, because it contradicts the plain language of the contract, which is not ambiguous on its face. See State v. Courtesy Motors, 590 P.2d 163, 165 (Nev.1979) ("[P]arol or extrinsic evidence is not admissible to add to, subtract from, vary, or contradict ... written instruments which dispose of property, or are contractual in nature and which are valid, complete, unambiguous, and unaffected by accident or mistake.").
 
 
 24
 When making the $45,000 payment, Marshall could perhaps have avoided the implication of waiver by making clear his intent to insist on fulfillment of the condition at a later date; then Empire's acceptance of the payment might have been an implicit modification of the agreement, obligating Empire to provide further proof before the date of closing. Marshall was, however, anything but clear about his intent to insist on additional proof. As the district court found:
 
 
 25
 At no time prior to, or at the time of, the payment of the forty-five thousand dollars ($45,000), was any agreement made between Empire and Marshall, or discussions had between the parties that Marshall was not satisfied with the proofs supplied under the sales agreement. The only issue that arose was that Marshall was not totally satisfied with the description of the property to be conveyed.
 
 
 26
 This finding is not clearly erroneous, as discussed below.[5] Marshall points out that his title attorney, Hollingsworth, did not complete his review of the title documents until after Marshall made the $45,000 payment; Marshall claims this is evidence that neither Marshall nor Empire considered his payment as ending the ongoing discussions of Empire's title. However, it appears that Hollingsworth's review concerned only the property description in Empire's proposed deed: Hollingsworth's report made numerous suggestions to correct discrepancies between Empire's deed and the title documents delivered on December 11. Marshall eventually accepted the revised property description.[6] There is, therefore, no clear error in the district court's view that, after receiving the title documents on December 11, 1990, Marshall found them acceptable and paid the $45,000. Then, satisfied that Empire owned the property and could convey it, Marshall and Empire jointly set about wording a deed to be coextensive with Empire's interest in the property.
 
 
 27
 We conclude that, before making the $45,000 payment, Marshall had notice of the state of Empire's title from the Hill, Cassas reports, and that Marshall had no objection to Empire's proof, which he had received the month before. The plain language of the extension agreement indicates that the parties intended for Marshall to determine the acceptability of Empire's proof before making the first payment. Accordingly, we affirm the district court's conclusion that Marshall's payment of $45,000 constituted either an acceptance of proof or a waiver of his right to insist on further proof.
 
 
 28
 Once the proof of ownership required by the extension agreement was accepted and the $45,000 was paid, there were no further conditions precedent to Marshall's obligation to purchase the property.[7] Empire was ready, willing and able to perform its obligations under the agreement. In consequence, Marshall breached the contract when he refused to tender payment.[8]
 
 
 29
 III. SPECIFIC PERFORMANCE WAS AN APPROPRIATE REMEDY
 
 
 30
 "[T]he decision to either grant or refuse specific performance is addressed to the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is shown." Serpa v. Darling, 810 P.2d 778, 782 (Nev.1991). Specific performance is available when: (1) the terms of the contract are definite and certain; (2) the remedy at law is inadequate; (3) the plaintiff has tendered performance; and (4) the court is willing to order it. Id.; Carcione v. Clark, 618 P.2d 346, 348 (Nev.1980).
 
 
 31
 Marshall contends that it was inequitable for the trial court to award specific performance because Marshall contracted for marketable title, and Empire could only deliver imperfect, unmarketable title. The objective marketability of Empire's title is, however, irrelevant, because Marshall accepted or waived any defects.
 
 
 32
 We conclude that the order of specific performance was entirely appropriate. Empire can convey to Marshall all the property described in the deed prepared by Hollingsworth. Specific performance is the usual remedy for breach of contracts for the sale of realty, because land is unique. Cf. Carcione, 618 P.2d at 348. Furthermore, the sales agreement itself provides that it is specifically enforceable by either party.
 
 
 33
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Empire is a Colorado corporation. Marshall is a citizen of Nevada. The amount in controversy exceeds $50,000. The district court's jurisdiction was based on 28 U.S.C. Sec. 1332(a), and we have jurisdiction under 28 U.S.C. Sec. 1291
 
 
 [2]
 Paragraph 1 will be referred to as the "extension agreement". The purchase price was to be $2,650,000. On April 10, 1990, Empire acquired CLM's interest in the property for $650,000
 
 
 [3]
 Marshall insists that he could not have accepted Empire's proof of ownership because Empire never produced any proof dating back farther than 1962. The objective adequacy of Empire's proof is, however, irrelevant to the issue of whether Marshall accepted it or waived the condition precedent
 
 
 [4]
 Certain items in the parties' correspondence prior to the sales agreement indicate that the extension agreement was originally conceived as Marshall suggests
 
 
 [5]
 The correspondence surrounding the payment is admissible on the issue of waiver; it is not excluded by the parol evidence rule, which excludes correspondence dated prior to or contemporaneously with the execution of the sales agreement, but which does not exclude correspondence surrounding performance of the agreement. See Courtesy Motors, 590 P.2d at 165 & n. 1
 
 
 [6]
 The district court's finding to that effect is supported by the letter of May 7, 1991, from Sylvan Marshall (Hugh Roy Marshall's attorney) to Glen Kahn (Empire's attorney), which stated: "Hollingsworth ... advises me that the work on your proofs will be complete, apparently satisfactory, within forty-eight hours from now."
 
 
 [7]
 The sales agreement stated: "[S]ubject only to the provisions of [the extension agreement]," "[t]his [Sales] Agreement constitutes MARSHALL'S binding, specifically enforceable agreement to purchase the Property," and "EMPIRE's binding, specifically enforceable promise and agreement to sell."
 
 
 [8]
 Marshall claims the district court clearly erred when it found that Marshall refused to go through with the transaction for cash flow reasons and found that Marshall was estopped from asserting dissatisfaction with Empire's title. Because Marshall accepted or waived proof of title by making the payment, we need not consider his reasons for later attempting to reject Empire's title