132 Nev., Advance Opinion 49

# IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| GOLDEN ROAD MOTOR INN, INC., A NEVADA CORPORATION D/B/A ATLANTIS CASINO RESORT SPA, Appellant/Cross-Respondent, vs. SUMONA ISLAM, AN INDIVIDUAL, Respondent/Cross-Appellant, and MEI-GSR HOLDINGS, LLC, A NEVADA LIMITED LIABILITY COMPANY D/B/A GRAND SIERRA RESORT, WHICH CLAIMS TO BE THE SUCCESSOR IN INTEREST TO NAV-RENO-GS, LLC, Respondent. | No. 64349 <br><br> **FILED** <br><br> JUL 21 2016 <br><br> TRACIE K. LINDEMAN CLERK OF SUPREME COURT BY _____ CHIEF DEPUTY CLERK |
| SUMONA ISLAM, AN INDIVIDUAL, Appellant, vs. GOLDEN ROAD MOTOR INN, INC., A NEVADA CORPORATION D/B/A ATLANTIS CASINO RESORT SPA, Respondent. | No. 64452 |
| MEI-GSR HOLDINGS, LLC, D/B/A GRAND SIERRA RESORT, Appellant/Cross-Respondent, vs. GOLDEN ROAD MOTOR INN, INC., A NEVADA CORPORATION D/B/A ATLANTIS CASINO RESORT SPA, Respondent/Cross-Appellant. | No. 65497 |

Consolidated appeals and cross-appeals from district court orders in a contract and tort action (Docket No. 64349) and awarding

11/3/16: Corrected per letter to publishers, CJ

16-22640

attorney fees (Docket Nos. 64452 and 65497). Second Judicial District Court, Washoe County; Patrick Flanagan, Judge.

*Affirmed in part, reversed in part, and remanded.*

Dotson Law and Robert A. Dotson, Reno; Lemons, Grundy & Eisenberg and Robert L. Eisenberg, Reno,
for Golden Road Motor Inn, Inc., dba Atlantis Casino Resort Spa.

Law Offices of Mark Wray and Mark D. Wray, Reno,
for Sumona Islam.

Cohen-Johnson, LLC, and H. Stan Johnson and Steven B. Cohen, Las Vegas,
for MEI-GSR Holdings, LLC, dba Grand Sierra Resort.

_____

BEFORE THE COURT EN BANC.

## *OPINION*

By the Court, DOUGLAS, J.:

In this appeal, we are asked to consider (1) whether a noncompete agreement is reasonable and enforceable, (2) whether an alteration of electronic information amounts to conversion, and (3) whether one gaming establishment misappropriated another gaming establishment's trade secrets.

Casino host Sumona Islam entered into an agreement with her employer, Atlantis Casino Resort Spa, to refrain from employment, association, or service with any other gaming establishment within 150 miles of Atlantis for one year following the end of her employment. Islam eventually grew dissatisfied with her work at Atlantis and, while

searching for work elsewhere, altered and copied gaming customers' information from Atlantis' computer management system. Soon after, she resigned from Atlantis and began working as a casino host at Grand Sierra Resort (GSR), where she accessed the computer management system to enter the copied information. Without knowing the information was wrongfully obtained, GSR used this and other information conveyed by Islam to market to those customers.

As to the noncompete agreement, we affirm the district court, concluding that the type of work from which Islam is prohibited is unreasonable because it extends beyond what is necessary to protect Atlantis' interests and is an undue hardship on Islam. We further conclude that because the work exclusion term is unreasonable, the agreement is wholly unenforceable, as we do not modify or "blue pencil" contracts. With regard to Atlantis' conversion claim based on Islam's alteration of electronic customer information, which Atlantis quickly restored, we affirm the district court's denial. The minimal disruption and expense incurred were insufficient to require Islam to pay the full value of the information. Finally, as to the misappropriation of trade secrets claim, we conclude that Atlantis failed to demonstrate that GSR knew or should have known the player information was obtained by improper means and therefore affirm the district court's finding of nonliability.[1]

---

[1]We also affirm the parties' appeals from attorney fees awards, except that we reverse the award to Atlantis against Islam because the district court erred by prohibiting Islam's review of the itemized attorney fees.

## BACKGROUND

While working as a casino host at Atlantis, Islam executed several agreements pertaining to her employment. Pursuant to those agreements, Atlantis restricted Islam from sharing confidential information, disseminating intellectual property, and downloading or uploading information without authorization. Additionally, a noncompete agreement prohibited Islam from employment, affiliation, or service with any gaming operation within 150 miles of Atlantis for one year following the end of her employment.[2]

After more than three years at Atlantis, Islam became dissatisfied with her work environment. As Islam pursued employment elsewhere, she altered and concealed the contact information for 87 players in Atlantis' electronic database. She also hand-copied players' names, contact information, level of play, game preferences, credit limits, and other proprietary information from the database onto notebook paper. Soon after, she resigned, and when newly assigned casino hosts attempted to contact players formerly assigned to Islam, they discovered that the

---

[2]In particular, the noncompete agreement provides as follows:

> In the event that the employment relationship between Atlantis and Team Member ends for any reason, either voluntary or non-voluntary, Team Member agrees that (s)he will not, without the prior written consent of Atlantis, be employed by, in any way affiliated with, or provide any services to, any gaming business or enterprise located within 150 miles of Atlantis Casino Resort for a period of one (1) year after the date that the employment relationship between Atlantis and Team Member ends.

SUPREME COURT
OF
NEVADA

(O) 1947A

4

information had been altered. Despite Islam's actions, Atlantis was able to fully restore the correct contact information for its players, incurring $2,117 in repair expenses.

Meanwhile, GSR interviewed Islam for a position as a casino host. During the hiring process, GSR personnel advised Islam not to bring anything from Atlantis but herself and her established relationships. Despite GSR's request, when Islam began working at GSR, she entered certain player information she had copied from Atlantis' database into GSR's database. Evidence adduced at trial also indicated that Islam communicated copied information to GSR by email. However, Islam never presented to GSR personnel the notebooks containing the copied information and repeatedly insisted that the information she provided was from her own "book of trade."[3] Thus, GSR used the information it received from Islam to market to Atlantis players.

Thereafter, Atlantis became aware that GSR hired Islam and that GSR was marketing to its players. Atlantis sent a letter to GSR, informing GSR of Islam's noncompete agreement, that Islam may have confidential information, and that GSR was to refrain from using that information. In response, GSR sent a letter to Atlantis advising that it was not in possession of trade secret information and that the information provided by Islam came from her book of trade. GSR additionally requested that Atlantis provide more specific information as to what

---

[3]The district court found that a casino host's "book of trade" is a collection of "names and contact information of guests with whom the host has developed relationships through [the host's] own efforts."

Atlantis believed was protectable as a trade secret. Atlantis did not comply with GSR's request.

Subsequently, Atlantis filed a complaint against both Islam and GSR, alleging seven causes of action and requesting a restraining order. The district court issued a restraining order prohibiting Islam from employment with GSR. The parties later stipulated to a preliminary injunction pending resolution of the case, and GSR served Atlantis with an offer of judgment. However, Atlantis rejected the offer and a bench trial ensued.

As between Atlantis and Islam, the district court found Islam liable for breach of contract and violation of the Nevada Uniform Trade Secrets Act and imposed a permanent injunction prohibiting Islam from further use of Atlantis' trade secrets. The district court awarded Atlantis compensatory and punitive damages, in addition to attorney fees and costs. However, the district court also found that Islam was not liable for tortious interference with contractual relations or conversion and ruled that the noncompete agreement was unenforceable. As to Atlantis' claims against GSR, the district court found that GSR was not liable for tortious interference with contractual relations or misappropriation of trade secrets and awarded GSR attorney fees and costs based on its offer of judgment, but denied fees requested under NRS 600A.060.

All three parties appealed. Atlantis challenges the noncompete and conversion rulings in its claims against Islam, and the tortious interference and attorney fees rulings in its claims against GSR. Islam's appeal challenges the award of attorney fees to Atlantis. GSR challenges the denial of attorney fees under NRS 600A.060.

## DISCUSSION

"We review the district court's legal conclusions de novo." *Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224, 228, 181 P.3d 670, 672 (2008). However, "this court will not disturb a district court's findings of fact unless they are clearly erroneous and not based on substantial evidence." *Int'l Fid. Ins. Co. v. State*, 122 Nev. 39, 42, 126 P.3d 1133, 1134-35 (2006).

*Atlantis v. Islam*

### Noncompete agreement

Atlantis argues that the noncompete agreement signed by Islam was reasonable and enforceable. Even if the noncompete agreement was unenforceable as written, Atlantis argues that the agreement should be preserved by judicial modification of provisions that are decidedly too broad. In contrast, Islam and GSR argue that the court properly found the noncompete agreement unreasonable and correctly determined that the proper remedy was to void the contract as a whole. Further, Islam and GSR contend that courts may not create a contract for the parties that the parties did not intend.

### Reasonableness

Contract interpretation is a legal question we consider under a de novo standard of review. *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005). Under Nevada law, "[a] restraint of trade is unreasonable, in the absence of statutory authorization or dominant social or economic justification, if it is greater than is required for the protection of the person for whose benefit the restraint is imposed or imposes undue hardship upon the person restricted." *Hansen v. Edwards*, 83 Nev. 189, 191-92, 426 P.2d 792, 793 (1967). Time and territory are important

 

factors to consider when evaluating the reasonableness of a noncompete agreement. *Id.* at 192, 426 P.2d at 793. However, "[t]here is no inflexible formula for deciding the ubiquitous question of reasonableness." *Ellis v. McDaniel*, 95 Nev. 455, 458-59, 596 P.2d 222, 224 (1979). Thus, we look to our caselaw.

In *Jones v. Deeter*, an employer that performed lighting services hired an assistant, who agreed in writing not to compete within 100 miles of Reno/Sparks for five years subsequent to the end of his employment. 112 Nev. 291, 292, 913 P.2d 1272, 1273 (1996). After three months, the employer fired his assistant and, when the assistant sought work elsewhere, the employer brought suit against him to enforce the noncompete agreement. *Id.* at 293, 913 P.2d at 1273. We concluded that the five-year restriction imposed too great a hardship for the employee and was not necessary to protect the employer's interests, even in light of the employer's argument that developing a customer base in the industry was difficult. *Id.* at 296, 913 P.2d at 1275.

Also, in *Camco, Inc. v. Baker,* we held that a noncompete agreement term of two years and "within fifty miles of any area which was the 'target of a corporate plan for expansion'" was unreasonable. 113 Nev. 512, 519-20, 936 P.2d 829, 833-34 (1997). We explained "that the covenant at issue [was] overly broad as to future territory for possible expansion," and thus, operated "as a greater restraint on trade than [was] necessary to protect [the former employer's] interests." *Id.*

In this case, similar to *Jones* and *Camco,* we conclude that the term prohibiting Islam from employment, affiliation, or service with any gaming business or enterprise is overly broad, as it extends beyond what is necessary to protect Atlantis' interests. According to the term, Islam is

Supreme Court
of
Nevada

(O) 1947A

8

prohibited from being employed, for instance, as a custodian, at every casino within a 150-mile radius. Yet, in such a hypothetical, it is unlikely that Islam would be luring players from Atlantis; thus, Atlantis' interests would remain protected. Additionally, similar to *Jones*, the work exclusion term presents an undue hardship for Islam. The agreement's prohibition of *all* types of employment with gaming establishments severely restricts Islam's ability to be gainfully employed. For these reasons, we deem the term to be overbroad and unreasonable.[4]

*Enforceability*

Under Nevada law, such an unreasonable provision renders the noncompete agreement wholly unenforceable. *See Jones*, 112 Nev. at 296, 913 P.2d at 1275 (holding that the noncompete agreement as a whole was unenforceable after concluding that a particular provision was unreasonable). Rightfully, we have long refrained from reforming or "blue penciling"[5] private parties' contracts. *See Reno Club, Inc. v. Young Inv. Co.*, 64 Nev. 312, 323, 182 P.2d 1011, 1016 (1947) ("This would be virtually creating a new contract for the parties, which . . . under well-settled rules

---

[4]In accord with this conclusion, the Georgia Court of Appeals has stated that "[a] noncompete covenant is too broad and indefinite to be enforceable where it contains no limit on the work restricted and effectively prohibits an employee from working for a competitor in any capacity." *Lapolla Indus., Inc. v. Hess*, 750 S.E.2d 467, 474 (Ga. Ct. App. 2013).

[5]"The 'blue-pencil test' is '[a] judicial standard for deciding whether to invalidate the whole contract or only the offending words.'" Griffin Toronjo Pivateau, *Putting the Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 Neb. L. Rev. 672, 681 (2008) (quoting *Blue-pencil test*, *Black's Law Dictionary* (8th ed. 2004)).

SUPREME COURT
OF
NEVADA

(O) 1947A

of construction, the court has no power to do."). In *All Star Bonding v. State*, we reaffirmed that "[w]e are not free to modify or vary the terms of an unambiguous agreement." 119 Nev. 47, 51, 62 P.3d 1124, 1126 (2003) (internal quotation omitted); *see Kaldi v. Farmers Ins. Exch.*, 117 Nev. 273, 278, 21 P.3d 16, 20 (2001) ("It has long been the policy in Nevada that absent some countervailing reason, contracts will be construed from the written language and enforced as written." (internal quotation omitted)). Under Nevada law, this rule has no exception for overbroad noncompete agreements, thus Atlantis' failure to suggest that the noncompete agreement is ambiguous leaves us only to apply our clear precedent. However, our precedent appears inconsequential to the dissent's blue-penciling advocacy, as they, too, fail to charge the contract with ambiguity before picking up the pencil. But even if an argument as to the contract's ambiguity were offered, and even if it had merit, reformation may still be inappropriate, as the dissent points to no Nevada case reforming ambiguous noncompete agreements. Thus, we act in conformance with our precedent when we refrain from rewriting the parties' contract.

Importantly, we have not overturned or abrogated our caselaw establishing our refusal to reform parties' contracts where they are unambiguous. Nonetheless, citing to *Hansen*, 83 Nev. at 192, 426 P.2d at 793-94, and *Ellis*, 95 Nev. at 458, 596 P.2d at 224, Atlantis contends that if the noncompete agreement was overly broad and unreasonable, the district court was required to modify it. In opposition, GSR contends that Atlantis misconstrues *Hansen* and *Ellis* because the cases do not allow for the court's modification of a noncompete agreement. According to GSR, the cases provide for modification of a preliminary injunction rather than the original contract. We agree with GSR.

The procedural posture of the case at bar distinguishes it from *Hansen* and *Ellis*, and likens it to *Jones*. Both *Hansen*, 83 Nev. at 191, 426 P.2d at 793, and *Ellis*, 95 Nev. at 457, 596 P.2d at 223, were appeals from district court orders granting preliminary injunctions. The particular thing modified after finding the terms of the employment contracts unreasonable were the injunctions, not the employment contracts. *See, e.g., Hansen*, 83 Nev. at 193, 426 P.2d at 794 ("We deem the restriction thus modified to be reasonable."). Thus, the blue pencil was not taken up. In contrast, in *Jones*, the appeal followed a final judgment on the merits of the noncompete agreement's reasonableness and enforceability. 112 Nev. at 293, 913 P.2d at 1274. We held that the entire agreement was unenforceable after concluding that the five-year time restriction provision was unreasonable. *Id.* at 296, 913 P.2d at 1275. Thus, here, as in *Jones*, the unreasonable work exclusion term renders the contract as a whole unenforceable. *See* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 681-82 (1960) ("[M]ost courts either issue an injunction which is regarded as reasonable, even though narrower than the terms of the restraining covenant, or refuse enforcement altogether." (footnote omitted)).

The dissent cites to caselaw from other jurisdictions to argue that Nevada should similarly indulge. Other states are divided on whether to reform parties' contracts. *Compare Federated Mut. Ins. Co. v. Whitaker*, 209 S.E.2d 161, 164 (Ga. 1974) (holding that the entire "covenant must fall because this court has refused to apply the 'Blue-pencil theory of severability'" (internal quotations omitted)), *with Farm Bureau Serv. Co. of Maynard v. Kohls*, 203 N.W.2d 209, 212 (Iowa 1972) (upholding a lower court's finding that a noncompete agreement was

SUPREME COURT
OF
NEVADA

(O) 1947A

unreasonable, but rejecting its conclusion that the contract as a whole was therefore void). Georgia courts explicitly considered and adamantly rejected the blue pencil way:

> We have given careful consideration to the severance theory, and we decline to apply it. . . .
>
> "Courts and writers have engaged in hot debate over whether severance should ever be applied to an employee restraint. The argument against doing so is persuasive. For every covenant that finds its way to court, there are thousands which exercise an in terrorem effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor, or who are anxious to maintain gentlemanly relations with their competitors. Thus, the mobility of untold numbers of employees is restricted by the intimidation of restrictions whose severity no court would sanction. If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable. . . ."
>
> There are some good reasons in support of the doctrine of severance. However, we conclude that those reasons are not of sufficient weight to offset those reasons for refusing to apply the doctrine. In short, we have weighed the "blue-pencil" doctrine in the balance, and found it wanting.

*Richard P. Rita Pers. Servs. Int'l, Inc. v. Kot*, 191 S.E.2d 79, 81 (Ga. 1972) (quoting Blake, *supra*, at 682-83).[6] We are persuaded by Georgia's rationale, but there are additional reasons for abstaining.

Our exercise of judicial restraint when confronted with the urge to pick up the pencil is sound public policy. Restraint avoids the possibility of trampling the parties' contractual intent. *See* Pivateau, *supra*, at 674 ("[T]he blue pencil doctrine . . . creates an agreement that the parties did not actually agree to."); *Reno Club*, 64 Nev. at 323, 182 P.2d at 1016 (concluding that creating a contractual term operates beyond the parties' intent and the court's power). Even assuming only minimal infringement on the parties' intent, as the dissent suggests, a trespass at all is indefensible, as our use of the pencil should not lead us to the place of drafting. Our place is in interpreting. Moreover, although the transgression may be minimal here, setting a precedent that establishes

---

[6]We note that the Georgia Legislature implemented laws attempting to advance blue penciling in Georgia courts. *See* Ga. Code Ann. § 13-8-2.1 (repealed 2009); Ga. Code Ann. § 13-8-53(d) (2010). However, the Legislature's first attempt, Ga. Code Ann. § 13-8-2.1 (1990), providing that courts *must* reform unlawful contracts, was held unconstitutional by *Jackson & Coker, Inc. v. Hart*, 405 S.E.2d 253, 255 (Ga. 1991). *See Atlanta Bread Co. Int'l, Inc. v. Lupton-Smith*, 679 S.E.2d 722, 724-25 (Ga. 2009) ("[T]his Court has rejected a legislative attempt to usurp the application of standards of reasonableness to noncompetition covenants in employment agreements."). Another legislative attempt, Ga. Code Ann. § 13-8-53(d) (2010), providing that courts *may* blue pencil, did not affect Georgia's precedent. The Georgia Court of Appeals reiterated that "the rule is that the court will not sever or 'blue pencil' an unenforceable noncompete covenant and enforce reasonable restrictions in other noncompete covenants, but will declare all the noncompete covenants unenforceable." *Lapolla*, 750 S.E.2d at 473.

Supreme Court
of
Nevada

(O) 1947A

13

the judiciary's willingness to partake in drafting would simply be inappropriate public policy as it conflicts with the impartiality that is required of the bench, irrespective of some jurisdictions' willingness to overreach.

Restraint also preserves judicial resources. Pivateau, *supra*, at 674 ("Both [types of blue penciling] essentially turn courts into attorneys after the fact."). And restraint is consistent with basic principles of contract law that hold the drafter to a higher standard. *Williams v. Waldman*, 108 Nev. 466, 473, 836 P.2d 614, 619 (1992) ("[I]t is a well settled rule that '[i]n cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language.'" (alteration in original) (quoting *Jacobson v. Sassower*, 489 N.E.2d 1283, 1284 (N.Y. 1985))).

We have been especially cognizant of the care that must be taken in drafting contracts that are in restraint of trade. *Hansen*, 83 Nev. at 191, 426 P.2d at 793 ("An agreement on the part of an employee not to compete with his employer after termination of the employment is in restraint of trade and will not be enforced in accordance with its terms unless the same are reasonable."). A strict test for reasonableness is applied to restrictive covenants in employment cases because the economic hardship imposed on employees is given considerable weight. Ferdinand S. Tinio, Annotation, *Enforceability, Insofar as Restrictions Would Be Reasonable, of Contract Containing Unreasonable Restrictions on Competition*, 61 A.L.R. 3d 397, § 2b (1975). "One who has nothing but his labor to sell, and is in urgent need of selling that, cannot well afford to raise any objection to any of the terms in the contract of employment

SUPREME COURT
OF
NEVADA

(O) 1947A

14

offered him, so long as the wages are acceptable." *Menter Co. v. Brock*, 180 N.W. 553, 555 (Minn. 1920). Hence, leniency must favor the employee and the terms of the contract must be construed in the employee's favor.

Conversely, blue penciling favors the employer by presuming the employer's good faith.[7] Demonstrating compassion for the employer, one professor offered that "in most such cases, the employer does not require the promise because the employer is a hardhearted oppressor of the poor," instead, "the employer is engaged in the struggle for prosperity and must utilize all avenues to gain and retain the good will of customers." 15 Grace McLane Giesel, *Corbin on Contracts* § 80.15, at 120 (rev. ed. 2003). Further, "[t]he function of the law is to maintain a reasonable balance" because "a former employee may compete unfairly and an employer may oppress unreasonably." *Id.* This analysis sympathizes with employers at most and equivocates the employer's and employee's plight at least. However, it is plain that the scales are most imbalanced when the party who holds a superior bargaining position, and who is the contract drafter, drafts a contract that is greater than required for its protection and is thereafter rewarded with the court's legal drafting aid, as the other party faces economic impairment, restrained in his trade. In the context of an agreement that is in restraint of trade, a good-faith presumption benefiting the employer is unwarranted.

---

[7]Although we acknowledge that some courts only allow blue penciling "if the party who seeks to enforce the term obtained it in good faith," *Ellis v. James V. Hurson Associates, Inc.*, 565 A.2d 615, 617 (D.C. 1989) (internal quotations omitted), still other courts do not make good faith a condition of reformation, *see, e.g.*, *Farm Bureau*, 203 N.W.2d at 212.

Supreme Court
OF
Nevada

(O) 1947A

At the outset, the bargaining positions of the employer and employee are generally unequal. *Star Direct, Inc. v. Dal Pra,* 767 N.W.2d 898, 924 n.10 (Wis. 2009). When an employment contract is made, the party seeking employment must consent to almost any restrictive covenant if he or she desires employment. *Id.* Hence, even an employer-drafted contract containing unenforceable provisions will likely be signed by the employee. Under a blue pencil doctrine, "[t]he employer then receives what amounts to a free ride on" the provision, perhaps knowing full well that it would never be enforced. Pivateau, *supra,* at 690. Consequently, the practice encourages employers with superior bargaining power "to insist upon unreasonable and excessive restrictions, secure in the knowledge that the promise will be upheld in part, if not in full." *Streiff v. Am. Family Mut. Ins. Co.,* 348 N.W.2d 505, 509 (Wis. 1984).[8] It thereby forces the employee to bear the burden as employers carelessly, or

---

[8]A California court explains:

> Many, perhaps most, employees would honor these clauses without consulting counsel or challenging the clause in court, thus directly undermining the statutory policy favoring competition. Employers would have no disincentive to use the broad, illegal clauses if permitted to retreat to a narrow, lawful construction in the event of litigation.

*Kolani v. Gluska,* 75 Cal. Rptr. 2d 257, 260 (Ct. App. 1998). On the other hand, the "all or nothing" approach encourages employers to carefully draft agreements devoid of "overreaching terms for fear that the entire agreement will be voided." Kenneth R. Swift, *Void Agreements, Knocked-Out Terms, and Blue Pencils: Judicial and Legislative Handling of Unreasonable Terms in Noncompete Agreements,* 24 Hofstra Lab. & Emp. L.J. 223, 246 (2007).

intentionally, overreach. Pivateau, *supra*, at 689. "In the words of one commentator, '[t]his smacks of having one's employee's cake, and eating it too.'" *Id.* at 690 (quoting Blake, *supra*, at 683).

The dissent argues that refusal to blue pencil is antiquated. However, it has been noted that "eliminating the blue pencil doctrine comports with recent trends as courts have indicated a greater willingness to refuse to reform agreements that are not reasonable on their face." *Id.* at 674. Some states, such as Wisconsin, have even codified the "no modification rule." *See* Wis. Stat. § 103.465 (2012).[9] Based on the argument of antiquity, and the rule of law in other jurisdictions, the dissent would force the district court to change the contract to only prohibit Islam from being employed as a casino host.[10] The dissent's overreach in such an indulgent application of the doctrine is troubling.

---

[9]Wis. Stat. § 103.465 provides:

> A covenant by an assistant, servant or agent not to compete with his or her employer or principal during the term of the employment or agency, or after the termination of that employment or agency, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any covenant, described in this subsection, imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint.

[10]Even assuming that the blue pencil doctrine is not contrary to Nevada precedent and stated public policy, reformation is certainly not a mandate placed on a district court. Laura J. Thalacker & Hartwell Thalacker, *Non-Compete Laws: Nevada, Practical Law State Q&A* § 6

*continued on next page . . .*

SUPREME COURT
OF
NEVADA

(O) 1947A

17

Under a strict application of the blue pencil doctrine, "only the offending words are invalidated if it would be possible to delete them simply by running a blue pencil through them, as opposed to changing, adding, or rearranging words." Pivateau, *supra*, at 681 (internal quotation omitted). The dissent purports to reword the provision by changing the work exclusion term to limit it to employment as a casino host. Thus, the dissent embraces the most liberal form of the blue pencil doctrine, *id.* at 682, a use of judicial resources that is unwarranted and blurs the line between the bench and the bar.[11] As explained by the Supreme Court of Arkansas, "[w]e are firmly convinced that parties are not entitled to make an agreement, as these litigants have tried to do, that they will be bound by whatever contract the courts may make for them at some time in the future." *Rector-Phillips-Morse, Inc. v. Vroman*, 489 S.W.2d 1, 4 (Ark. 1973). Courts are not empowered to make private agreements. *Id.* Such actions are simply not within the judicial province. *Id.*

---

*. . . continued*

(2015) (suggesting that "[c]ourts in Nevada may, but are not required to, modify or blue pencil the terms in non-compete agreements and may enforce them as modified"). Under a review for discretion, the district court certainly did not abuse its discretion in refusing to redraft a noncompete agreement that banned the employer from "employment, affiliation, or service with any gaming operation." *See Dowell v. Biosense Webster, Inc.*, 102 Cal. Rptr. 3d 1, 11 (Ct. App. 2009) (affirming a lower court's invalidation of an overbroad noncompete clause prohibiting "an employee from rendering services, directly or indirectly, to a competitor").

[11]Redrafting the contract, rather than striking the offending work exclusion term, is the dissent's only option because striking the term renders the agreement unintelligible.

In light of Nevada's caselaw and stated public policy concerns, we will not reform the contract to change the type of employment from which Islam is prohibited. As written, the contract is an unenforceable restraint of trade. *See Hansen*, 83 Nev. at 191, 426 P.2d at 793 (recognizing that contracts in restraint of trade will not be enforced unless the terms are reasonable). Without a contract, there was no violation.[12] Accordingly, we affirm the district court's ruling as to the noncompete agreement.

*Conversion*

Atlantis claims the district court erred by determining that Islam was not liable for conversion. According to Atlantis, Islam converted its property when she altered the player contact information for 87 guests, taking control of its data in a form that was inconsistent with its property rights. Islam and GSR contend that conversion requires a more serious interference with property rights.

Nevada law defines conversion "as a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title *or* rights therein or in derogation, exclusion, or defiance of such title or rights." *M.C. Multi-Family Dev., LLC v. Crestdale Assocs., Ltd.*, 124 Nev. 901, 910, 193 P.3d 536, 542 (2008) (internal

---

[12]Based on our determination that the noncompete agreement was unenforceable, we also conclude that Atlantis' cause of action for tortious interference with a contractual relationship against GSR was properly dismissed as a matter of law. *See J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 274, 71 P.3d 1264, 1267 (2003) (requiring a valid and existing contract to establish an intentional interference with contractual relations claim).

quotations omitted). Furthermore, "conversion generally is limited to those severe, major, and important interferences with the right to control personal property that justify requiring the actor to pay the property's full value." *Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 328-29, 130 P.3d 1280, 1287 (2006).

We conclude that Islam's act of altering the player contact information in Atlantis' gaming database did not amount to conversion. The information was not lost, and with relatively minimal cost, the contact information was properly restored. To be sure, the interruption in marketing caused by Islam's conduct was not severe enough to justify requiring her to pay the full value of the information, which was estimated to be much more valuable than the cost of repair.[13] Therefore, we also affirm the district court's finding of no liability as to Atlantis' conversion claim against Islam.

*Attorney fees awarded to Atlantis against Islam*

Islam contends that the district court violated her right to due process by awarding Atlantis $308,711 in attorney fees without allowing her to view the itemized fees. In response, Atlantis contends that NRCP 54 does not require the detailed documentation that Islam sought.

We conclude that the district court's award of attorney fees to Atlantis against Islam without permitting Islam to review the itemizations was improper. *See Love v. Love*, 114 Nev. 572, 582, 959 P.2d 523, 529 (1998) (concluding that the district court's grant of attorney fees

---

[13]We note that the district court awarded Atlantis the cost of repair as compensation in its breach of contract claim.

based upon sealed billing statements unfairly precluded the opposing party from disputing the legitimacy of the award). Therefore, as to the award of attorney fees against Islam, we reverse and remand with instructions to allow Islam to review the itemized attorney fees.

*Atlantis v. GSR*

*Nevada Uniform Trade Secrets Act*

Atlantis contends that the district court's conclusions that GSR did not misappropriate its trade secrets, but that Islam did, are irreconcilable with one another. Thus, Atlantis claims that GSR is also liable for misappropriation. GSR argues that it did not misappropriate Atlantis' trade secrets because it reasonably relied on Islam's representation that she had relationships with each of the players she put in its database, and thus, GSR had no knowledge that the information was a trade secret.

We conclude that the district court's conclusion was not clearly erroneous because Atlantis failed to establish the essential elements of its misappropriation claim against GSR. The following was set forth by the United States District Court for the Northern District of California in interpreting California's almost identical Uniform Trade Secrets Act:

> The elements of a claim of indirect trade secret misappropriation . . . are: (1) the plaintiff is the owner of a valid trade secret; (2) the defendant acquired the trade secret from someone other than the plaintiff and (a) knew or had reason to know before the use or disclosure that the information was a trade secret and knew or had reason to know that the disclosing party had acquired it through improper means or was breaching a duty of confidentiality by disclosing it; or (b) knew or had reason to know it was a trade secret and that the disclosure was a mistake; (3) the defendant

Supreme Court
of
Nevada

(O) 1947A

used or disclosed the trade secret without plaintiff's authorization; and (4) the plaintiff suffered harm as a direct and proximate result of the defendant's use or disclosure of the trade secret, or the defendant benefitted from such use or disclosure.

*MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1114 (N.D. Cal. 2012). *Compare* Cal. Civ. Code § 3426.1 (2012), *with* NRS 600A.030(2).[14]

---

[14]NRS 600A.030(2) provides that "misappropriation" means as follows:

>        (a) Acquisition of the trade secret of another by a person by improper means;

>        (b) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

>        (c) Disclosure or use of a trade secret of another without express or implied consent by a person who:

>                (1) Used improper means to acquire knowledge of the trade secret;

>                (2) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

>                        (I) Derived from or through a person who had used improper means to acquire it;

>                        (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

>                        (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

*continued on next page . . .*

Atlantis failed to establish that GSR knew or should have known that the information Islam provided was a trade secret. GSR took steps to ensure that it did not receive trade secret information from Islam. GSR's hiring personnel advised Islam before she began working to bring only herself and her relationships when she left Atlantis. Additionally, GSR management sought and gained Islam's reassurance that the player information she communicated was built on her own relationships. Based on Islam's representations, there was no reason for GSR to know that it was using trade secrets that belonged to Atlantis.

Furthermore, Atlantis' letter to GSR did not sufficiently put GSR on notice that it was using wrongfully obtained player information. The letter expressed doubt as to whether GSR was in fact in possession of Atlantis' trade secrets and failed to identify the trade secrets. Atlantis' letter advised that there were "[p]otential [t]rade [s]ecret [v]iolations" and, rather elusively, communicated that "[i]f GSR has incorporated into its data base . . . confidential information that is the property of the Atlantis, we demand that GSR immediately advise us of the same." In addition to the uncertainty communicated by Atlantis' use of the terms "potential" and "if," Atlantis placed the onus on GSR to know what trade secrets GSR had in its possession that belonged to Atlantis. However, without Atlantis' player list, or Islam's candid insight, it was nearly impossible for GSR to know whether it was using Atlantis' trade secrets. Moreover,

---

. . . *continued*

(3) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

when GSR requested more specific information, Atlantis failed to provide it. Because GSR received both trade secret and nontrade secret information from Islam without knowing which, if any, information was protected, it cannot be said that GSR sufficiently knew or should have known that the information provided to it was a trade secret. *See MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 431 (E.D. Va. 2004) (limiting scope of protected documents to those identified as trade secrets).

An alternative result, which establishes the sufficiency of GSR's knowledge based on these facts, would be harmful to the casino host trade. To protect Atlantis' potential trade secrets, GSR would need to cease marketing to all players communicated to by Islam. This result would encourage all casino hosts' former employers to send letters accusing the host's new employer of trade secret violations, knowing that with no real claim of misappropriation, they could quash competition. The consequences would suffocate a casino host's very purpose, whose trade is built on providing its employer with relationships established with customers. Hosts provide a unique advantage to casinos by expanding a casino's client base, *Choctaw Resort Development Enterprise v. Applequist*, 161 So. 3d 1134, 1136 (Miss. Ct. App. 2015), and the result the dissent and Atlantis seek could stifle the trade.

Our holding considers the nature of the casino host's trade. With more specific information about which players were improperly solicited, GSR could have ceased its use of information improperly obtained while continuing its use of information rightfully obtained. We deem this to be the best outcome.

Therefore, we reject the assertion that GSR knew, or had reason to know, from Atlantis' vague accusations, that it was using information improperly obtained. We conclude that, without more, GSR appropriately relied on Islam's statements that the information she relayed was based on her own relationships and her book of trade. The district court properly held Islam responsible for her actions but distinguished Islam's conduct from that of GSR. Because the district court's determination that GSR did not misappropriate Atlantis' trade secrets was not clearly erroneous, we affirm.

*Attorney fees awarded to GSR against Atlantis*

Atlantis claims the district court's award of attorney fees in favor of GSR in the amount of $190,124.50, pursuant to GSR's NRCP 68 offer of judgment, is unsupported and should be vacated. GSR contends that it was entitled to the award of attorney fees based on the offer of judgment, but that it is additionally entitled to an award of attorney fees based on Atlantis' bad faith, pursuant to NRS 600A.060. We conclude that the district court properly awarded attorney fees pursuant to the offer of judgment. GSR made an offer that Atlantis rejected, and Atlantis failed to receive a more favorable judgment.[15] Upon a review of the record, we also conclude that the district court properly refused to award fees under NRS 600A.060 because Atlantis' claim was not brought in bad faith.[16] Thus, as

---

[15]We note that Atlantis' argument that the offer of judgment was invalid because it was made by a nonparty lacks merit.

[16]In the district court's order dated September 27, 2013, it found that Atlantis acted in bad faith in pursuing the misappropriation claim against GSR. However, the district court later denied the fees under NRS 600A.060 because it had already awarded attorney fees based on the offer

*continued on next page . . .*

SUPREME COURT
OF
NEVADA

(O) 1947A

to the district court's award of attorney fees between Atlantis and GSR, we affirm.

Based on the foregoing, we affirm the district court's judgment and attorney fees orders except as to the order awarding fees against Islam in favor of Atlantis. With respect to that order, we reverse and remand to the district court for further proceedings consistent with this opinion.

_____, J.
Douglas

We concur:

_____, J.
Cherry

_____, J.
Saitta

_____, J.
Gibbons

_____

... *continued*

of judgment. We conclude that substantial evidence did not support the district court's bad-faith finding, but we affirm because the district court reached the right result.

HARDESTY, J., with whom PARRAGUIRRE, C.J., and PICKERING, J., agree, dissenting in part:

While I agree that the non-compete agreement was written too broadly, there is no doubt that Islam and Atlantis agreed to restrict Islam's future employment as a casino host and that such a restriction is reasonable. Absent some showing of bad faith on Atlantis' part, of which there was none, I would follow the approach taken by this court and a majority of other courts and preserve the non-compete agreement by modifying or severing the overly broad provision and thereby maintain the restriction on Islam's future employment in a competing casino host position. Reformation is an equitable remedy, and here, the equities run in favor of Atlantis and against the employee who admittedly stole trade secret information from her employer to use in her new casino host job for a competitor. I therefore dissent from the majority's adoption of a minority view to invalidate the entire agreement. I also dissent from the majority's determination that GSR did not violate the Uniform Trade Secret Act. GSR had knowledge of the Islam/Atlantis non-compete and trade secret agreements soon after GSR hired Islam. As a result, GSR had reason to know that its new employee had acquired trade secrets by "improper means." NRS 600A.030(2)(a)-(c). Invalidating the non-compete agreement does not provide a defense to the use of trade secret information appropriated in violation of the enforceable trade secret agreement.

*Non-compete agreement*

A majority of courts agree that overly broad non-compete agreements should be altered, where possible, to recognize the intent of the parties and bring them within reasonable parameters. *See* Ferdinand S. Tinio, Annotation, *Enforceability, Insofar as Restrictions Would Be*

*Reasonable, of Contract Containing Unreasonable Restrictions on Competition*, 61 A.L.R. 3d 397, §§ 4-5 (1975) (outlining jurisdictions that allow some form of modification and those that do not). The modification test has been adopted by "most United States jurisdictions." *Data Mgmt., Inc. v. Greene*, 757 P.2d 62, 64 (Alaska 1988) (adopting the approach that allows a court to reasonably alter a non-compete agreement so long as the agreement was drafted in good faith). *See, e.g., Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 n.8 (Minn. 2002) (explaining that "a court at its discretion [can] modify unreasonable restrictions on competition in employment agreements by enforcing them to the extent reasonable"); *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 844 (Mo. 2012) ("[W]hen the provisions of a non-compete clause impose a restraint that is unreasonably broad, appellate courts still can give effect to its purpose by refusing to give effect to the unreasonable terms or modifying the terms of the contract to be reasonable."); *Merrimack Valley Wood Prods., Inc. v. Near*, 876 A.2d 757, 764 (N.H. 2005) ("Courts have the power to reform overly broad restrictive covenants if the employer shows that it acted in good faith in the execution of the employment contract."); *Cardiovascular Surgical Specialists, Corp. v. Mammana*, 61 P.3d 210, 213 (Okla. 2002) ("To cure an overly broad and thus unreasonable restraint of trade, an Oklahoma court may impose reasonable limitations concerning the activities embraced, time, or geographical limitation but it will refuse to supply material terms of a contract." (internal quotation marks omitted)); *Durapin, Inc. v. Am. Prods., Inc.*, 559 A.2d 1051, 1058 (R.I. 1989) ("We believe this is the appropriate time to choose the route that permits unreasonable restraints to be modified and enforced, whether or not their terms are divisible, unless the circumstances indicate bad faith or

deliberate overreaching on the part of the promisee."); *Simpson v. C & R Supply, Inc.*, 598 N.W.2d 914, 920 (S.D. 1999) (allowing modification of "noncompetition provisions to conform to the statutory mandate . . . via partial enforcement"). The policy behind this approach is that "[a]n otherwise reasonable restrictive covenant should not be held invalid because it is unreasonable solely as to [breadth] where voiding the agreement, rather than enforcing it in a reasonable way, would be contrary to legislative intent, and frustrate the intent of the parties." 17A C.J.S. *Contracts* § 381 (2011); *see also* Kenneth R. Swift, *Void Agreements, Knocked-Out Terms, and Blue Pencils: Judicial and Legislative Handling of Unreasonable Terms in Noncompete Agreements*, 24 Hofstra Lab. & Emp. L.J. 223, 249-50 (2007) (explaining that this test allows "courts [to] exercise their inherent equity powers to the extent necessary to protect the employer's legitimate business interest").

In addition to the modification test, the "blue-pencil test" also allows modification by permitting a court to delete an overly broad portion of a non-compete covenant and to enforce the remainder. *Id.*; *see also* 17A Am. Jur. 2d *Contracts* § 318 (2004) ("While recognizing that illegal contracts are generally unenforceable or void, a court may, where possible, sever the illegal portion of the agreement and enforce the remainder." (footnotes omitted)). Several jurisdictions have embraced this test. *See, e.g., Ellis v. James V. Hurson Assocs., Inc.*, 565 A.2d 615, 617 (D.C. 1989); *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 730 (Ind. 2008); *Hartman v. W.H. Odell & Assocs., Inc.*, 450 S.E.2d 912, 920 (N.C. Ct. App. 1994); *Star Direct, Inc. v. Dal Pra*, 767 N.W.2d 898, 916 (Wis. 2009).

Contrarily, the draconian all-or-nothing rule invalidates the entire contract if any part of the non-compete agreement is overly broad.

17A C.J.S. *Contracts* § 381 (2011). Only a few jurisdictions still use this approach. *See, e.g., Rector-Phillips-Morse, Inc. v. Vroman*, 489 S.W.2d 1, 5 (Ark. 1973); *Rollins Protective Servs. Co. v. Palermo*, 287 S.E.2d 546, 549 (Ga. 1982).

In this case, Islam signed a non-compete agreement more than a year after beginning her employment as a casino host with Atlantis. Pursuant to the non-compete agreement:

> In the event that the employment relationship between Atlantis and [Islam] ends for any reason, either voluntary or non-voluntary, [Islam] agrees that (s)he will not, without the prior written consent of Atlantis, *be employed by, in any way affiliated with, or provide any services to*, any gaming business or enterprise located within 150 miles of Atlantis Casino Resort for a period of one (1) year after the date that the employment relationship between Atlantis and [Islam] ends.

(Emphasis added.)

By modifying and narrowing the broad language describing the scope of Islam's future employment, this court can give effect to the admitted intent of the parties to restrict her future employment as a casino host. Therefore, the text "be employed by, in any way affiliated with, or provide any services to" should be narrowed to "be employed as a casino host," allowing the non-compete provision to survive.

The majority based its decision to invalidate the entire non-compete agreement on *Reno Club v. Young Investment Co.*, 64 Nev. 312, 182 P.2d 1011 (1947); *All Star Bonding v. State*, 119 Nev. 47, 62 P.3d 1124 (2003); *Kaldi v. Farmers Insurance Exchange*, 117 Nev. 273, 21 P.3d 16 (2001); and *Jones v. Deeter*, 112 Nev. 291, 913 P.2d 1272 (1996). The majority's reliance on *Reno Club*, *All Star Bonding*, and *Kaldi* is unfounded. Not only do *Reno Club*, *All Star Bonding*, and *Kaldi* fail to

discuss non-compete agreements, they also focus on ambiguity (not overbreadth), a factor that does not apply when deciding to alter a non-compete agreement. *See Reno Club*, 64 Nev. at 325, 182 P.2d at 1017 ("[T]here is no ambiguity or uncertainty in the meaning of the language employed in the option agreement . . . , and hence no room for judicial construction."); *All Star Bonding*, 119 Nev. at 51, 62 P.3d at 1126 (explaining that this court is "not free to modify or vary the terms of an unambiguous agreement" (internal quotation marks omitted)); *Kaldi*, 117 Nev. at 281, 21 P.3d at 21 (same); *see also* 17A C.J.S. *Contracts* § 381 (2011) (explaining that the three approaches to altering a non-compete agreement are used when the agreement is overly broad). Further, in *Jones*, this court determined that a five-year restriction was improper and, thus, concluded that the non-compete "covenant [was] per se unreasonable and therefore, unenforceable." 112 Nev. at 296, 913 P.2d at 1275. This conclusory determination should not be construed as establishing a strict rule against modifying and limiting unreasonable portions of non-compete agreements. In fact, this court has allowed preliminary injunctions based on non-compete agreements to be modified in order to make restrictions reasonable. *See, e.g., Ellis v. McDaniel*, 95 Nev. 455, 459, 596 P.2d 222, 225 (1979) (declining to enforce a preliminary injunction based on a non-compete agreement that "purport[ed] to prohibit [appellant] from practicing orthopedic surgery," but modifying the restriction to prohibit appellant "from engaging in the *general practice* of medicine"); *Hansen v. Edwards*, 83 Nev. 189, 191, 193, 426 P.2d 792, 793-94 (1967) (modifying an employment restriction from 100 miles outside of Reno with no time limitation to Reno's boundary limits for one year because "[a] preliminary injunction may be modified at any time whenever the ends of justice

SUPREME COURT
OF
NEVADA

(O) 1947A

require such action"). The procedural postures of *Ellis* and *Hansen* differ from this case as explained by the majority. While *Ellis* and *Hansen* did not use the expression "blue pencil," they effectively applied the doctrine by modifying the restrictions placed on the employee. Accordingly, I conclude that *Ellis* and *Hansen* demonstrate this court's willingness to preserve a non-compete agreement's reasonable terms.

Moreover, the majority's apparent adoption of the wholesale invalidation rule is a reversion to an antiquated, ill-favored rule. *See Durapin*, 559 A.2d at 1058 (explaining that "[m]ore recent court decisions . . . reject this all-or-nothing rule in favor of some form of judicial modification"); *see also Data Mgmt.*, 757 P.2d at 64 ("There is a need to strike a balance between protecting the rights of parties to enter into contracts, and the need to protect parties from illegal contracts. Obliterating all overbroad covenants not to compete, regardless of their factual settings, is too mechanistic and may produce unduly harsh results."). Quoting a law review article, the majority alleges that the "'recent trend[ ]'" of courts is to reject the blue pencil doctrine. Majority opinion *ante* at 17 (quoting Griffin Toronjo Pivateau, *Putting the Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 Neb. L. Rev. 672, 674 (2008)). Interestingly, this recent trend only includes six United States District Court cases, two of which are unpublished, issued from 2003 to 2007. *See* Pivateau, *supra*, at 694-97.

The majority provides several public policy arguments for refusing to adopt the blue pencil test: (1) altering the non-compete agreement may violate the parties' intent, (2) requiring a court to modify or blue pencil a non-compete agreement wastes judicial resources, and (3) leniency favors the employee because a non-compete agreement should

be construed against the employer who drafted it. I address each of these arguments in turn.

First, the court takes evidence of the parties' intent into consideration when modifying a non-compete agreement, so any infringement on the parties' intent should be minimal. And contrary to the majority's assertion that modification conflicts with the bench's impartiality, *see* majority opinion *ante* at 14, this evidence allows the modification of a non-compete agreement to be based on objective criteria. In fact, the court is able to accurately modify the non-compete agreement in this case because Islam and Atlantis acknowledge their intent to limit Islam's future employment as a casino host and protect Atlantis' gaming trade secrets. The trade secret agreement, which the majority does not invalidate, prohibits Islam from using or disseminating any intellectual property, including customer lists. The ethics and code of conduct agreement, which the majority also does not invalidate, prohibits Islam from disclosing confidential information, including customer lists. The non-compete agreement is an extension of this intent: it protects customer lists from being exploited by competing casinos in the event an employment relationship fails. Because the three agreements relate to each other, this court need not speculate as to the parties' intent. Applying the wholesale invalidation rule completely ignores, rather than violates, the parties' intent in this case.

Second, because the court is already tasked with determining whether the non-compete agreement is overbroad, deciding how to modify an agreement is a natural next step, such that only a negligible amount of extrajudicial resources are being expended. Additionally, the court will not always be charged with modifying an agreement, as such a decision is

discretionary. *See* Swift, *supra*, at 251. For example, "clear overreaching on the part of the employer may preclude a" court from exercising its discretion to modify. *Id.* Use of that discretion rejects the majority's suggestion that modification allows an employer to receive a "'free ride.'" Majority opinion *ante* at 16 (quoting Pivateau, *supra*, at 690). Instead of incentivizing an employer to draft a stricter-than-necessary non-compete agreement with the knowledge that the court will simply limit it, as the majority asserts, modification discourages bad faith while also providing a safety net to protect agreements that were inadvertently drafted too broadly. And in this case, there is no evidence to suggest Atlantis acted in bad faith in preparing the agreements or seeks to enforce the non-complete agreement against Islam in an overly broad way. Atlantis' claim is directed to Islam's future employment as a casino host and does not seek to limit her employment in another capacity with another casino.

Finally, while the majority focuses on the unfairness to the employee, it is important to note that non-compete agreements are intended to balance the employer's and the employee's interests. *See Employers May Face New Challenges in Drafting Noncompetes*, 19 No. 2 Nev. Emp. L. Letter 4 (2013) ("[R]estrictive covenants strike a delicate balance between employers' interests—protecting confidential information and institutional knowledge, preserving hard-won customer and client relationships, and incentivizing key talent to remain loyal—and employees' interests in maintaining work mobility and the freedom to command competitive compensation for their skills."). Thus, we must not forget that non-compete agreements are extraordinarily important to Nevada businesses, especially in industries that rely on proprietary client lists, such as Atlantis. *See Traffic Control Servs., Inc. v. United Rentals*

*Nw., Inc.*, 120 Nev. 168, 172, 87 P.3d 1054, 1057 (2004) ("Employers commonly rely upon restrictive covenants . . . to safeguard important business interests."). On this note, the majority also contends that modification favors the employer. While the all-or-nothing rule ultimately favors the employee—to the extreme disadvantage of the employer—by removing any restriction placed on future employment, modification also favors the employee by appropriately limiting the restriction.

Moreover, it is difficult to reconcile the majority's concern for Islam in this case when the facts demonstrate that Islam sought to compete as a casino host using trade secret information she appropriated from Atlantis. Islam committed theft, and GSR sanctioned Islam's behavior.

*Uniform Trade Secret Act*

Atlantis' cease and desist letter informed GSR that Islam was improperly soliciting guests in violation of its trade secret agreement, a copy of which was enclosed with the letter. The letter did not "express[ ] doubt," as the majority depicts. *See* majority opinion *ante* at 23. The letter stated that Atlantis "reasonably believe[d] that [Islam's] contact with these guests was facilitated by improper use of Atlantis' information." In response, GSR merely rejected Atlantis' assertions, maintained that there was no wrongdoing, and wrongly asserted that it did not possess any of Atlantis' property. Importantly, during her interview process, Islam provided GSR with a copy of her non-compete agreement with Atlantis. Because the non-compete agreement sought to restrict Islam from employment and, as such, using her book of trade in a competing casino, GSR was on notice that using any information provided by Islam may be improper.

The non-compete agreement and the cease and desist letter play a crucial role in Atlantis' claim against GSR for violation of the Uniform Trade Secret Act. The majority concluded that GSR did not know, or have a reason to know, that it had used improperly obtained information. I disagree.

As defined in NRS 600A.030(2):

"Misappropriation" means:

. . . .

(c) . . . use of a trade secret of another without express or implied consent by a person who:

. . . .

(2) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(I) Derived from or through a person who had used improper means to acquire it;

(II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

As stated previously, the non-compete and trade secret agreements sought to restrict Islam from employment *and* using any guest information in a competing casino for one year. Because GSR had knowledge of the non-compete and trade secret agreements soon after it hired Islam, it "had reason to know" that it was potentially using trade secret information "[d]erived from or through a person who owed a duty

SUPREME COURT
OF
NEVADA

(O) 1947A

to . . . maintain its secrecy."[1]  NRS 600A.030(2)(c)(2)(III).  Accordingly, I conclude that any use of Atlantis' guest information after it hired Islam and decidedly after receiving the cease and desist letter constituted misappropriation in violation of the Uniform Trade Secret Act.

The majority contends that this conclusion incentivizes employers to accuse their former employees' new employers of violating trade secrets.  *See* majority opinion *ante* at 24.  This dubious risk of dishonesty is outweighed by the culture of distrust that the majority is creating by holding that a casino can ignore another casino's report of wrongdoing.

*Conclusion*

Because (1) the non-compete agreement can and should be narrowed instead of being invalidated and (2) GSR misappropriated Atlantis' trade secrets, I believe that the district court erred in dismissing Atlantis' breach of the non-compete agreement claim against Islam, tortious interference with a contractual relationship claim against GSR, and violation of the Uniform Trade Secret Act claim against GSR.

---

[1]The majority highlights the fact that Atlantis failed to provide GSR with specific information upon GSR's request.  *See* majority opinion *ante* at 24.  Misappropriation only requires a "reason to know," NRS 600A.030(2)(c)(2), so Atlantis was under no obligation to provide evidence to GSR.  Atlantis' letter to Islam, which was enclosed with Atlantis' letter to GSR, explained that it possessed electronic records showing Islam's sabotage, and its guests who were not a part of Islam's book of trade had been contacted by GSR.  This information sufficiently demonstrates that GSR "had reason to know" about the trade secret violation.  NRS 600A.030(2)(c)(2).

Supreme Court
of
Nevada

(O) 1947A

11

Therefore, I would reverse the judgment of the district court with regard to these claims.

                                        _____, J.
                                        Hardesty

We concur:

_____, C.J.
Parraguirre

_____, J.
Pickering

SUPREME COURT
OF
NEVADA

(O) 1947A